**KATZ LAW OFFICE PC**
Michael I. Katz (SBN 181728)
Nathan M. Carle (SBN 304846)
3420 Bristol Street, Suite 600
Costa Mesa, CA 92626
Telephone: (213) 561-4680
Email: mkatz@katzruby.com
Email: ncarle@katzruby.com

*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| WCDS BUYER, INC., a Delaware corporation; and WCDS PARENT, LLC, a Delaware limited liability company, | Case No. 8:24-cv-2523 |
| Plaintiffs, | **COMPLAINT FOR:** |
| v. | 1. **SECURITIES FRAUD (§ 10(B) OF THE SECURITIES EXCHANGE ACT OF 1934 & RULE 10B-5)** |
| PAYAM SOHRAB, an individual; and JOSEPH ALEGRE, an individual, | 2. **VIOLATION OF THE SECURITIES EXCHANGE ACT §20** |
| Defendants. | 3. **FRAUD** |
| | 4. **CONSPIRACY TO COMMIT FRAUD** |
| | 5. **AIDING AND ABETTING FRAUD** |
| | 6. **VIOLATION OF §§ 25400 & 25500 OF THE CALIFORNIA CORP. CODE** |
| | 7. **VIOLATION OF §§ 25401 & 25501 OF THE CALIFORNIA CORP. CODE** |
| | 8. **VIOLATION OF § 25504.1 OF THE CALIFORNIA CORP. CODE** |
| | **JURY TRIAL DEMANDED** |

COMPLAINT

Plaintiffs WCDS Buyer, Inc. ("**Buyer, Inc.**") and WCDS Parent, LLC ("**Parent, LLC**") (together "**Plaintiffs**" or "**Buyers**") bring this action for their Complaint against Dr. Payam Sohrab ("**Dr. Sohrab**"), and Joseph Alegre ("**Alegre**") (together, Dr. Sohrab and Alegre referred to as the "**Officers**" or "**Defendants**".)

Plaintiffs hereby state and allege as follows:

## NATURE AND SUMMARY OF THE ACTION

1.     Plaintiffs bring this action for damages against all Defendants for securities fraud, common law fraud, conspiracy to defraud Plaintiffs, and aiding and abetting knowing and intentional misrepresentations and omissions of material fact in connection with the sale of securities.

2.     The subject transactions closed on July 1, 2022 (the "**Closing**") pursuant to a series of agreements, including an Equity Purchase Agreement (the "**EPA**") and a Securities Exchange Agreement (the "**Rollover Agreement**") entered into between Plaintiffs, the Founders, Frontier Holdco and others (all of the foregoing agreements and documents are collectively referred to as the "**Purchase Agreements**").  True and correct copies of EPA and Rollover Agreement are attached hereto as, respectively, **Exhibits "A" and "B."**  The business of the entities whose securities were sold and purchased was the provision of administrative, support and other services for forty dental and orthodontic practices commonly known as "**West Coast Dental**" and situated principally in Southern California.

3.     Plaintiffs were formed by Court Square Capital Partners, LLC, a New York based private equity firm ("**Court Square**"), in order to enter into the Purchase Agreements and purchase the securities and consummate the transactions contemplated thereunder.

4.     Prior to entering into the Purchase Agreements, the Defendants provided information to Court Square and Plaintiffs regarding the business, affairs and operations of West Coast Dental in meetings, correspondence, a confidential information presentation, a management presentation, electronic data room records

1

and information, and other forms of communications.  That information included, but was not limited to, financial statements, operating reports, revenues, expenses, profits, assets, liabilities, employees, contracts, history and other information concerning West Coast Dental (collectively, the "**WCD Disclosures**").  The Purchase Agreements included numerous representations and warranties regarding the WCD Disclosures and other matters (the "**Representations and Warranties**").

5.      The WCD Disclosures and the Representations and Warranties included fraudulent and materially false, misleading and incomplete financial statements, operating reports, business records, and other information concerning West Coast Dental's business, operations, revenues, profits, assets, liabilities, historical performance, growth trajectories, and the like.  Defendants knew that the WCD Disclosures and the Representations and Warranties were fraudulent and materially false, misleading and incomplete, and deceived Plaintiffs into entering into the Purchase Agreements and agreeing to the highly inflated purchase price for the securities thereunder.

6.      The fraudulent and materially false, misleading and incomplete WCD Disclosures and Representations and Warranties concerned the following matters (together referred to as "Defendants' Multiple Frauds"):

         a.  The "**PPP Fraud**;"

         b.  The "**99/99 Fraud**;"

         c.  The "**RevRec Fraud**;"

         d.  The "**Bad Debt Fraud**;"

         e.  The "**$500K Fraud**;" and

         f.  The "**Calimesa Fraud**."

7.      Court Square and Plaintiffs relied on the WCD Disclosures and the Representations and Warranties, including Defendants' Multiple Frauds, in entering into the Purchase Agreements and agreeing to the purchase price for the securities thereunder, which did not reflect the real or actual value of those securities.

Plaintiffs would not have entered into the Purchase Agreements or agreed to the purchase price for the securities thereunder had Plaintiffs known the true facts and circumstances concerning West Coast Dental and its financial statements, revenues, profits, assets, liabilities, growth trends and other matters.  Defendants' Multiple Frauds played a material role in inducing Plaintiffs to enter into the Purchase Agreements and consummate the transactions contemplated thereunder.

8.     The impacts of Defendants' multiple frauds included:

a.     Material overstatements of revenues, profits and accounts receivable;

b.     Material understatements of the allowance for doubtful accounts and bad debt expense;

c.     Material understatements of liabilities;

d.     Creation of a false appearance of material growth in revenues, profits and business trajectory; and

e.     Concealment that seven of the West Coast Dental entities had received $4 million in Paycheck Protect Program loans on the basis of applications filed with the U.S. Small Business Administration in February and March 2021 that Alegre (the Chief Financial Officer) knew to be false and inaccurate when filed.

9.     The business of West Coast Dental was conducted through sixteen affiliated entities:

a.     Fifteen California professional dental corporations that owned and controlled forty dental practices (the "**Practice Entities**") that provided general and specialty dental services, including orthodontics, in forty dental offices situated principally throughout Southern California.  The Practice Entities were owned and controlled, directly or indirectly, by the three "**Founders**" (described below); and

b.     West Coast Dental Services, Inc., a California corporation ("**WCD, Inc.**"), which served as the administrative support services organization for all of the Practice Entities.  WCD, Inc.'s support services included accounting, billing, collections, computer systems and technology, supplies purchasing,

marketing, recruiting, and human resources. The three Founders Dr. Farid Pakravan ("**Dr. Pakravan**"), Dr. Soleyman Cohen-Sedgh ("**Dr. Cohen**") and Dr. Farhad Manavi ("**Dr. Manavi**"), (together, in their individual capacity, Drs. Pakravan, Cohen and Manavi are referred to as the "**Founders**") owned and controlled, directly or indirectly, 100% of WCD, Inc.'s outstanding shares and served as its only directors and as its ultimate decision-making executives. As required by the terms of the EPA, shortly before the Closing, WCD, Inc. "converted" into West Coast Dental Administrative Services, LLC, a California limited liability company ("**WCDAS**"), and by statute WCDAS succeeded to all of the rights and obligations of WCD, Inc. and was in substance considered the same entity as WCD, Inc.

10.    Under the Purchase Agreements, Plaintiffs acquired all of the shares of WCD, Inc. (the "**Shares**") (which converted into WDCAS immediately before the Closing) from the following fourteen shareholders (collectively referred to as the "**Selling Shareholders**"):

a.    The three "Founders" of WCD, Inc.—Drs. Pakravan, Cohen and Manavi;

b.    ten additional individuals and trusts comprised of the spouses and former spouses of the three Founders and trustees of trusts created for the benefit of the three Founders, their spouses, their former spouses and their family members (collectively, the "**Other Shareholders**"); and

c.    Frontier Holdco, Inc. ("**Frontier Holdco**"), which is owned by the Founders, Defendant Shareholders, and the Other Shareholders.

11.    For convenience, Frontier Holdco, WCD, Inc., WCDAS and the Practice Entities are together referred to hereinafter as the "**WCD Entities**."

12.    Plaintiffs, which were formed by Court Square, consist of the following:

a.    WCDS Parent, LLC, a Delaware limited liability company ("**Parent, LLC**"). Parent, LLC is majority owned by Court Square; and

4

COMPLAINT

b.      WCDS Buyer, Inc., a Delaware corporation ("**Buyer, Inc.**"), which is a wholly owned subsidiary of Parent, LLC.

13.      Based on the multimillion-dollar valuation of the West Coast Dental business that was agreed to under the Purchase Agreements, Plaintiffs paid the Selling Shareholders the following (collectively, the "**Purchase Price**"):

a.      Several million dollars in cash (the "**Cash Portion of the Purchase Price**");

b.      Several million dollars in shares of Parent, LLC (the "**Stock Portion of the Purchase Price**"); and

c.      The $5 Million Note (a true and correct copy of which is attached hereto as **Exhibit "C"**).

### *The PPP Loan Fraud*

14.      The Founders and Defendant Alegre (the CFO of WCD, Inc. and of WCDAS following the statutory conversion) prepared and filed false loan applications on behalf of WCD, Inc. and six of the Practice Entities (together referred to as the "**Seven WCD Affiliated Borrowers**") with the Small Business Administration (the "SBA") in February and March 2021 (the "**Loan Applications**") for an aggregate of approximately $4 million in Paycheck Protection Program loans (the "**$4 Million 2021 PPP Loans**").  The Seven WCD Affiliated Borrowers received the full amounts they applied for.  At the time the Loan Applications were filed, however, the Founders and Alegre knew—based on prior written advice received from WCD, Inc.'s outside accountants—that the Loan Applications they had prepared, signed and filed with the SBA were materially false and inaccurate.

15.      In a civil settlement of a whistle-blower lawsuit filed by a third party and a False Claims Act investigation by the United States Department of Justice ("DOJ") against the Seven WCD Affiliated Borrowers, in 2024 the three Founders paid an aggregate of approximately $6.3 million to the DOJ, representing a

repayment and restitution of the $4 Million 2021 PPP Loans and an additional $2.3 million in claims by the DOJ. WCDAS incurred approximately $1 million in legal fees and costs in connection with the DOJ investigation and settlement during 2023 and 2024 and was thus damaged as a result of the PPP Fraud.

16.     The Founders and Alegre did not disclose to Plaintiffs that the above-described fraud had been perpetrated upon the SBA, that the WCD Entities had a material undisclosed liability to the Federal government for this fraud, or that the 2021 and 2022 balance sheets, income statements and other financial statements included as part of the EPA were false and misleading by reason of omission of this fraud and liability. Moreover, the EPA included express representations and warranties that that all documents provided to Plaintiffs relating to the $4 Million 2021 Loans were "**true, correct and complete**." (Ex. A Par. 4.05(c)). That was false and misleading.

### *The 99/99 Fraud*

17.     A significant part of the West Coast Dental revenues and profits derived from the orthodontics business at nearly all of the forty dental practices. This was touted as a major area of growth opportunity for the business. However, the Founders and Officers presented a materially false and misleading picture of revenues, profits and historical growth through perpetration of the "99/99 Fraud," which commenced in November 2021 and continued through the Closing. Under the 99/99 Fraud, the Founders, Alegre and Dr. Sohrab (the Chief Executive Officer of WCD, Inc. and of WCDAS following the statutory conversion), knowingly and intentionally collaborated and conspired to deviate from historical business practices and promote the extension of in-house financing credit at no-interest ("**IHF**") to orthodontic patients (a) (i) who could not afford braces and (ii) who would not have qualified for IHF credit under the long-standing historical business practices of West Coast Dental before the November 2021 implementation of the 99/99 Fraud, and (b) on irresponsible and materially different payment terms than historical practices and

COMPLAINT

well outside of industry norms.

18.    As a result of the 99/99 Fraud, new patient case starts, revenues and reported (but fraudulent) profits soared and created the materially false illusion that the orthodontic business was burgeoning.  In truth, however, and concealed from Plaintiffs, was that substantially all of the increases were the result of the 99/99 Fraud, defaults on orthodontic IHF contract payments had soared, and bad debt had climbed materially, collections had plummeted, and profits were materially overstated.  These facts were not disclosed to Plaintiffs, even though the WCD Disclosures and the Representations and Warranties stated that the business operating practices had been conducted in the ordinary course of business without material change and the accounting methods and procedures were applied consistently for all periods presented to Plaintiffs.

### The RevRec Fraud

19.    Commencing March 2022 and continuing through the Closing, WCD, Inc. and the Practice Entities, under the authority and direction of the Founders and Officers, materially changed (without disclosing to Plaintiffs) their method of accounting for orthodontic revenues upon starting (selling) orthodontic patient cases in order to create the false and deceptive appearance of increasing revenues from the orthodontic business but without increasing the case price.  Prior to March 2022 they recognized approximately $1,396 in revenues in their income statements upon starting/selling most orthodontic cases (*i.e.*, approximately 35% of the average orthodontic case cost of $4,000).  By contrast, beginning in March 2022, without increasing the price to patients, they increased the amount or revenue recognized at the start of the cases to approximately $2,196 (*i.e.*, approximately 55% of the same $4,000 average case cost) (the "**RevRec Fraud**").  Hence, an orthodontic case that was started before March 2022 contributed $1,396 in revenues to the income statement, whereas commencing in March 2022 and thereafter that same case, without any increase in the price of the case, contributed $800 more (*i.e.*, $2,196) in

7

COMPLAINT

revenues to the income statement, representing a 57% increase, despite no change in the price of the case to the patient or the amount of work performed by the dental office. This material change in accounting was not disclosed to Plaintiffs, even though the WCD Disclosures and the Representations and Warranties stated that the accounting methods had not changed.

20. The change resulted in material increases in revenues and net income—*i.e.*, several hundred thousand dollars per month—since there were 400 to 500 new orthodontic cases started/sold each month, but without necessitating an increase in the number of cases started/sold. The Founders and Officers collaborated and conspired to do this in order to artificially inflate WCD, Inc.'s and the Practice Entities' revenues and profits, and create the illusory appearance of growth in their orthodontic business.

### *The Bad Debt Fraud*

21. Commencing in December 2021, at Alegre's direction and with approval from the Founders, WCD, Inc. and the Practice Entities made material changes to their accounting methods and procedures for calculating their allowance for uncollectible accounts receivable and bad debt expense—which had a material impact on profits reflected in the financial statements provided to Plaintiffs. This was not disclosed to Plaintiffs. In addition, at Alegre's instruction and with approval from the Founders, this new methodology was applied sporadically and inconsistently after its adoption in December 2021—*i.e.*, in some months the bad debt dictated by this new method was recorded in the financial statements and in some months it was not. The result was that bad debt expense in the financial statements provided to Plaintiffs was understated by approximately $1 million in March and April 2022 alone, while profit in those same months was overstated by the same amounts.

22. Alegre and the Founders and others knowingly and intentionally manipulated the income statements of WCD, Inc. and the Practice Entities from at

COMPLAINT

least January to April 2022 as described above in order to create the false appearance of increasing profitability and business growth. This material change in accounting methods and practices was not disclosed to Plaintiffs, even though the WCD Disclosures and the Representations and Warranties stated that the accounting methods and practices had not changed.

### *The $500K Fraud*

23.     In the ordinary course of West Cost Dental's business, the Practice Entities historically and customarily had reconciling items on their bank reconciliations. The reconciling items commonly included deposits-in-transit from third-party patient financing companies, which represented payments recorded in the Practice Entities' accounting records as having been received, but where the actual monies had not yet been deposited into the bank accounts of the Practice Entities. The Founders and Alegre concealed from Plaintiffs that there had been approximately $500,000 in deposit-in-transit reconciling items in the bank reconciliations that related to the 2020 and 2021 calendar year business of the Practice Entities, but that had never been collected. Thus, they should have been written off before the Closing under ordinary accounting practices, but they were not. (They were all written off post- Closing once new management discovered them.)

24.     Had this $500,000 been written off before the Closing as was appropriate under WCD, Inc.'s ordinary and historical accounting practices, the accounts receivable and net income represented in the financial statements included in the Purchase Agreements, and as to which Representations and Warranties were made, would have been lower by approximately $500,000 (the "**$500K Fraud**"). However, the Founders and Alegre chose to omit these facts and instead concealed them from Plaintiffs.

### *The Calimesa Fraud*

25.     The Founders knowingly and intentionally delayed by several months

9

COMPLAINT

before the Closing the planning and commencement of construction of a new dental office—the Calimesa office—in violation of the Representations and Warranties in the Purchase Agreements that the business and operations of WCD, Inc. had been and would be conducted in the ordinary course of business through the Closing. (*See* Ex. A paragraphs 4.07 and 5.04(a)).  Had planning and construction been carried out in the ordinary course of business, WCD, Inc. would have incurred $300,000 in construction costs before the Closing at the expense of the Selling Shareholders.  However, due to the deliberate delay this same sum was spent after the Closing at the expense of Plaintiffs.  Further, this intentional delay also resulted in WCD, Inc. incurring rent expense of approximately $50,000 after the Closing that it would not have incurred if the planning and construction had been carried out in the ordinary course of business.

26.    This material change in business and operating practices, and the impacts on the assets and liabilities of WCD, Inc., was not disclosed to Plaintiffs, even though the WCD Disclosures and the Representations and Warranties stated that the business of the WCD Entities would be conducted in the ordinary course of business without material change.

### *Plaintiffs Seek Relief for These Frauds*

27.    As a result of these frauds, Plaintiffs entered the Purchase Agreements and agreed to pay a Purchase Price for the Shares of WCD, Inc. that was inflated and did not reflect their real or actual value.  Through this action, Plaintiffs seek compensatory and punitive damages.

### JURISDICTION AND VENUE

28.    This Court has subject matter jurisdiction over this dispute pursuant to Section 27 of the Securities Exchange Act of 1934, 15 U.S.C. § 78aa and 28 U.S.C. § 1331 because this action arises under the laws of the United States.  This Court has supplemental subject matter jurisdiction over Plaintiffs' state-law claims pursuant to 28 U.S.C. § 1367(a).

COMPLAINT

29.    The Court has personal jurisdiction over the Officers because they reside within this District and the acts and omissions stated herein occurred within this District.

30.    Venue is appropriate in this Court pursuant to Section 27 of the Securities Exchange Act of 1934, 15 U.S.C. § 78aa and 28 U.S.C. § 1391(b) because the Officers reside within this District and all Defendants are subject to this Court's personal jurisdiction.

## THE PARTIES

### A.    PLAINTIFFS

31.    Plaintiff Buyer, Inc. is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in New York, New York.  Plaintiff Buyer, Inc, is a wholly-owned subsidiary of Parent, LLC, which in turn is an affiliate of Court Square.

32.    Plaintiff Parent, LLC is a limited liability company organized and existing under the laws of the State of Delaware with its principal place of business in New York, New York.  It owns 100% of the outstanding shares of Buyer, Inc.  Court Square owns a majority interest in Parent, LLC, while the Selling Shareholders and certain individuals in present and former management of the WCD Entities own minority interests.

### B.    DEFENDANTS

33.    Defendant Dr. Sohrab is an individual and resident of the State of California, with a principal residence located in Orange County, California.  At all times relevant to this dispute, Dr. Sohrab was the Chief Executive Officer ("CEO") of WCD, Inc. and WCDAS and reported to the Founders.  Dr. Sohrab played a material role in most matters involving the business, affairs and operations of the WCD Entities, including decisions relating to (a) the 99/99 Fraud, (b) the RevRec Fraud, (c) preparation of the business and operations of the WCD Entities for sale to Plaintiffs, and (d) preparation of the WCD Disclosures and conveyance of same to

Court Square and Plaintiffs. Dr. Sohrab actively and knowingly participated in multiple meetings with Court Square and Plaintiffs wherein the WCD Disclosures were misrepresented and the 99/99 Fraud and the RevRec Fraud were perpetrated. Dr. Sohrab played a significant role in preparing the WCD Disclosures and in conveying same to Court Square and Plaintiffs. Pursuant to his contract with the Founders, Dr. Sohrab was paid a bonus, based on the value of the Purchase Price, of approximately $6 million.

34.      Defendant Alegre is an individual and resident of the State of California, with a principal residence located in Los Angeles, California. At all times relevant to this dispute, Alegre served as the Chief Financial Officer ("CFO") of WCD, Inc. and WCDAS and reported to Dr. Sohrab and to the Founders. Alegre played a material role in all matters involving the business, affairs and operations of the WCD Entities concerning finances, IHF contracts, accounting, record-keeping, financial statement preparation and oversight, and other matters. Alegre played a material role in all decisions relating to (a) the PPP Fraud, (b) the 99/99 Fraud, (c) the RevRec Fraud, (d) the Bad Debt Fraud, and (e) preparation of the WCD Disclosures and conveyance of same to Court Square and Plaintiffs, including active participation in multiple meetings with Court Square and Plaintiffs where the written WCD Disclosures were discussed and misrepresented and the Defendants' Multiple Frauds were concealed. Alegre played a significant role in preparing the WCD Disclosures and in conveying same to Court Square and Plaintiffs. Alegre also played a significant role in directly interfacing with the Founders as Alegre's office was located in the same building and on the same floor as the Founders' offices. Pursuant to his contract with the Founders, Alegre was paid a bonus, based on the value of the Purchase Price, of approximately $3 million upon the Closing.

**FACTUAL BACKGROUND**

35.      Plaintiffs entered into the Purchase Agreements with the Founders, Frontier Holdco, and all of the Other Shareholders as of June 1, 2022. The Closing

occurred on July 1, 2022. In connection with the Closing, Plaintiffs paid the Selling
Shareholders the Purchase Price.

### A.    West Coast Dental Is a Large Dental Services Organization in Southern California.

36.    As of the Closing, the business of West Coast Dental was comprised of
the WCD Entities. The Practice Entities provided general and specialty dental
services, including orthodontics, in forty dental offices situated principally
throughout Southern California. Each dental practice consisted of licensed dentists,
orthodontists, specialists, dental assistants, and front and back office support staff,
all of whom were employed by or under contract with the Practice Entities.

37.    WCD, Inc. served as the administrative support services organization
for the Practice Entities, and as such provided essential support services such as
accounting, billing, collections, computer systems and technology, purchasing,
marketing, recruiting, and human resources pursuant to the Administrative Service
Agreements with each of the Practice Entities.

38.    The Founders owned and controlled, directly or indirectly, 100% of the
WCD Entities' outstanding shares and served as their Directors and ultimate
decision-making executives.

39.    Two of the three Founders—*i.e.*, Drs. Pakravan and Cohen—were on
site substantially every day at the corporate headquarters of WCD, Inc. in
Brentwood, California. They also visited the dental practices from time to time as
they desired. On a daily basis they communicated with the executive operating
leadership of WCD, Inc. and the Practice Entities, including, but not limited to, Dr.
Sohrab, Alegre, the Chief Operating Officer and the Chief Clinical Officer. Dr.
Manavi ceased his daily involvement in management of the WCD Entities in
approximately 2018, but retained his one-third ownership, directly or indirectly, of
all of the outstanding shares of the WCD Entities and he continued to serve as one of
their three Directors (along with Drs. Pakravan and Cohen).

40.    Routinely Drs. Pakravan and Cohen communicated with the WCD Entities' department heads, including, among others, the Vice President of Revenue Cycle Management who headed up the department for all billings and collections, the Vice President of Marketing, the four Regional Managers who oversaw the daily operations of the forty dental practices, the Call Center Director, and others who led the daily operations of West Coast Dental.  Drs. Pakravan and Cohen were actively involved with and aware of all important activities of the WCD Entities.  All major decisions and many daily and ordinary decisions required the advice, counsel and approval of Drs. Pakravan and Cohen.

41.    The Founders had complete authority and discretion in adding, selling or closing dental offices, including if, and when to do so, over the approximately three decades during which they grew the organization from one dental office to forty.

42.    After the Closing, the Founders continued to serve as the officers, directors and beneficial owners of the outstanding shares of the Practice Entities.

**B.    The Founders Market WCD, Inc. for Sale.**

43.    In or around the summer of 2021, the Founders decided that they wished to put West Coast Dental on the market for sale.  By virtue of their failed attempt to sell West Coast Dental in or around 2018, they were familiar with the substantial preparation, work, documentation, time and process involved in preparing West Coast Dental for the marketing and sale process.

44.    Embarking on the sale effort included, but was not limited to, extensive work and decisions by the Founders, Alegre and others, including, but not limited to, the following: (a) selecting an investment banking firm to represent the Founders in connection with the marketing and sale process (the Founders engaged SVB Leerink, a division of Silicon Valley Bank, hereinafter "**SVB**"), (b) selecting a law firm to represent the Founders in the sale process, including, but not limited to, preparation of disclosure schedules and negotiation of the sale agreements (the

14
COMPLAINT

Founders engaged the "**Dykema Firm**"), (c) collecting, organizing and listing all of the contracts, agreements and records of the WCD Entities, (d) compiling, creating, reviewing and approving reports detailing and describing all aspects of the business, operations and affairs of the WCD Entities, (e) preparing, reviewing and approving reports and schedules detailing the number of patients, production, collections, payroll, and expenses of the WCD Entities over a period of at least three years on an office-by-office and a collective basis, (f) preparing, reviewing and approving balance sheets, income statements, statements of cash flow, and operating reports detailing the results of operations and financial performance of the WCD Entities over a period of three years on an office-by-office and a collective basis, (g) documenting and describing the accounting systems, accounting methods and practices, practice management system for compiling patient treatment information and keeping track of all billings and collections, marketing systems, and recruiting system, (h) preparing and disseminating to prospective investors a confidential information presentation ("**CIP**") that described all major aspects of the WCD Entities' business, operations, affairs and management, and (i) preparing for and conducting "management presentations" to prospective purchasers.

45.    Alegre recommended that the Founders engage SVB as their investment banker for the sale process. Alegre had worked with SVB while at one of his prior engagements as CFO. The Founders interviewed SVB and engaged them.

46.    The Founders engaged the Dykema Firm as their legal counsel for the sale because they had worked with Dykema in the 2018 failed sale effort, they had used the Dykema law firm on other matters, and Dykema had considerable experience in dental sale transactions.

47.    Internally at WCD, Inc., commencing in approximately the late summer of 2021, the Founders tasked Alegre to work with the department heads and management of WCD, Inc. to assemble, compile and organize the documents, records and materials that would be needed in connection with the sale process.

Alegre collaborated and coordinated with all of the department heads, his staff in the accounting department, Dr. Sohrab, SVB and the Dykema Firm to pull together and coordinate the compilation and preparation of all of the documents, records and materials needed for the sale process.  On a constant basis Alegre reported to the Founders on the status, challenges, process, and timing of these efforts.

48.    In preparing the CIP—the ultimate offering document that would be circulated to prospective buyers—the Founders needed to prepare a comprehensive description of the business, operations, growth, financial performance and operating leadership, and projections of the future growth of the WCD Entities.  This necessitated a collaborative effort between the Founders, the Officers, SVB, the Dykema Firm, and others.

49.    Among other things, the CIP presented financial statements, operating statements and other financial information regarding the WCD Entities' dental and orthodontic operations, including historical growth trends, and projections of the future growth expectations.  The initial CIP, dated January 19, 2022, was later supplemented by a Management Presentation dated March 1, 2022 (the CIP and the Management Presentation along with numerous schedules, financial and operating reports, schedules and other documents, the "**WCD Offering Documents**").  The WCD Offering Documents included historical and recent financial statements and operating statements on a combined and office-by-office and business-line by business-line basis (*i.e.*, general dentistry and orthodontics).  They included balance sheets, income statements and operating statements covering the business and operations of the WCD Entities through April 30, 2022.  Much of the information, including the financial and operating statements, included in these documents was also the subject of the Representations and Warranties in the Purchase Agreements. The Representations and Warranties included representations that the financial statements had been prepared on a consistent basis with the "Agreed Accounting

1   Principles" of the WCD Entities.  (*See* Ex. A paragraph 11.01).1

2       50.     In compiling and preparing the WCD Offering Documents, and in

3   deciding to omit disclosure of the material deviations from the WCD Entities'

4   Agreed Accounting Principles, Alegre collaborated with the Founders, Dr. Sohrab,

5   SVB, and others.  The WCD Offering Documents highlighted and stressed

6   information concerning the purported growth and performance of the orthodontic

7   operations.

8       51.     The Officers prepared descriptions of the WCD Entities' business,

9   operations and historical growth, including explanations of that growth, in the WCD

10  Offering Documents.  Those descriptions included, but were not limited to, the

11  dental operations, orthodontic operations, and IHF credit extended to dental and

12  orthodontic patients.  Drafts of these materials were reviewed, commented upon and

13  approved by the Founders.  However, nowhere in the WCD Offering Documents

14  was there any disclosure concerning Defendants' Multiple Frauds as being the

15  reasons for the purported growth in the orthodontic operations and the overall

16  operations and profitability reflected in WCD Offering Documents.  Plaintiffs did

17  not learn of these until after the Closing.

18      52.     In January 2022, the Founders authorized SVB on behalf of the WCD

19  Entities to provide the CIP and other financial information to Court Square.  In late

20  February 2022, the Founders gave Court Square access to a virtual data room that

21  Alegre had organized with assistance from SVB (the "**Virtual Data Room**").  The

22  Virtual Data Room contained, among other things, historical and recent financial

23  statements and operating reports that covered the dental and orthodontic operations

24  and performance of the WCD Entities in detail, as well as information, reports, lists

25

26      _____

27      [1] Per paragraph 11.01 of the EPA, "Agreed Accounting Principles' means GAAP [Generally Accepted Accounting Principles], applied consistently with historical past practices; provided, however, that if more than one methodology exists for calculating asset and liability balances under GAAP, the methodology employed will be based on the generally accepted accounting principles applied in preparation of the Company's Financial Statements dated as of December 31, 2021."

28

17

COMPLAINT

and tables concerning their dental practices, accounts receivable, revenue and profits trajectories, marketing, employees, payroll, contracts, and many other matters, all so that Court Square could evaluate them for potential acquisition.

53.     Following receipt of the CIP, in late January 2022, Court Square delivered a letter to SVB expressing interest in acquiring the Company and indicating a range in values that Court Square would pay, subject to a number of conditions, including obtaining financing and more information from the Company (the "**CSC Interest Letter**").

54.     In response to the CSC Interest Letter and requests from Court Square, the Founders in collaboration with SVB instructed Alegre and Dr. Sohrab to prepare additional information for delivery to Court Square together with supplemental materials concerning the business, operations and financial performance of the WCD Entities.  Alegre and Dr. Sohrab collaborated with others at the WCD Entities and SVB and worked to assemble the information and prepare drafts of these supplemental presentations that were ultimately part of the WCD Offering Documents.  The drafts, which contained material omissions and misrepresentations as detailed below, were reviewed with and approved by the Founders, SVB, and others.  The final version was delivered to Court Square in March 2022.

55.     Following delivery of the supplemental Management Presentation, Court Square requested additional information concerning the financial and operating performance of the Company.  These requests were made to representatives of SVB and Alegre.  In response, the Founders directed Alegre to assemble, organize and provide the information to Court Square.  Some of the information was provided via the Virtual Data Room, some was provided through SVB, and some was provided directly by Alegre to Court Square.

56.     The Founders and Officers understood and knew that Court Square would base its purchase price on all of the information provided to Court Square. The Founders, Alegre and Dr. Sohrab, as well as SVB, understood and knew that the

COMPLAINT

revenues, profits and growth trajectory of the business would have major influences on Court Square's valuation analysis. As such, these parties understood that maximizing the Company's revenues, profits and growth trajectories were important in maximizing the price that Court Square would be willing to pay.

### C.    The Equity Purchase Agreement (EPA).

57.    The EPA, which was signed effective June 1, 2022, was accompanied by several exhibits and a 159 page "**Disclosure Schedule**" that included extensive details about many aspects of the business and operations of the WCD Entities, including financial statements, operating reports, employee information, PPP loan and forgiveness applications, ownership information, and other matters.

58.    Pursuant to the transactions contemplated under the Purchase Agreements, (a) Parent, LLC was created and formed and funded its wholly-owned subsidiary, Buyer, Inc., (b) the Selling Shareholders conveyed all of their shares in WCDAS/WCD, Inc., (c) Buyer, Inc. acquired and became the owner of 100% of the shares in WCDAS/WCD, Inc., (d) WCD, Inc. underwent a statutory conversion into and changed its name to WCDAS, (e) Court Square became the majority and controlling shareholder of Parent, LLC, and (f) the Selling Shareholders received the Purchase Price in consideration for their shares in WCDAS/WCD, Inc.

### D.    Unknown to Plaintiffs, the Officers Took Multiple Steps to Artificially Inflate West Coast Dental's Value by Means of Multiple Frauds and The Resulting Purchase Price of the Shares.

1.    *The 99/99 Fraud: Starting in November 2021, Defendants Removed Numerous Underwriting Controls on In-House Financing, Extended the Payment Terms, Increased Sales of Orthodontic Cases to Patients Who Could Not Afford and Would Not Be Able to Pay, but Made No Adjustment for the Resulting Increased Bad-Debt Expense (the "99/99 Fraud").*

59.    A significant part of the revenues and profits of the WCD Entities came

19

COMPLAINT

from the orthodontics business at the dental practices.  This was touted in the WCD Offering Documents and by the Founders, Dr. Sohrab, Alegre and others in meetings and other communications as a major area of growth opportunity.  Plaintiffs relied on these materials and this information in evaluating the potential acquisition and in arriving at the enterprise value of the WCD Entities and the Purchase Price agreed to by Plaintiffs.

60.    According to reports from WCD, Inc. accounting staff to Plaintiffs collected after the Closing, in or around the third quarter of 2021, when the Founders had been contemplating putting the business on the market for sale, they and Dr. Sohrab and Alegre had collaborated on how to increase the revenues and profits of the WCD Entities' orthodontic business.  This led to their decision to implement the 99/99 Fraud effective November 2021, which consisted of the following:

a.    Offering all orthodontic patients, regardless of their creditworthiness, the option of paying for their treatment with (i) only a $99 down payment (compared to at least $300 for patients without substantial insurance previously), and (ii) monthly installments of $99 regardless of the expected life of the orthodontic treatment (compared to an average of $175 per month and an average term of 17 months and subject to a maximum term of 22 months previously),[2] and

b.    Eliminating eight of the nine long-standing credit qualification conditions for extending IHF credit (described below) in the first instance.

61.    For a long period of time before November 2021, the Company had imposed the following nine conditions for extending IHF credit to orthodontic

---

[2] With an average price of approximately $4,000 for an orthodontic case that involved 24 months of treatment, a patient who made a $99 down payment would have more than 39 months to pay off the IHF.  However, with payment time extending long beyond completion of treatment (*i.e.*, 17 months on average) and abandonment of the creditworthiness conditions, it was to be expected that collections would suffer and defaults would increase greatly.  That is what happened.  Payment defaults spiked immediately and the collection rate on the Company's IHF contracts dropped from 91% to 75%.  However, Defendants falsely represented that collections had remained at the 91% level and had not declined.

COMPLAINT

patients (*eight of which were abandoned under the 99/99 Fraud*): (1) patient's submission of a completed credit application, (2) proof of patient's employment and earnings, (3) patient's Social Security Number, (4) an acceptable FICO credit score, (5) patient's application for and denial of third-party financing, (6) a minimum down payment of at least $300 or more for patients without insurance, (7) a maximum length of time to pay (in equal installments) the monthly payments equal to the expected life of the case minus two months (but in no event longer than 22 months), (8) vaulting of a credit or debit card to allow for automatic charges against the card, and (9) review and approval of the financing terms, credit application and signed credit agreement by a member of WCD, Inc.'s Revenue Cycle Department.

62.    The 99/99 Fraud was implemented in November 2021. Immediately it resulted in a material increase in orthodontic case sales, from an average of 305 cases per month previously to an average of 376. At an average price of approximately $4,000 per case and approximately $1,396 of revenue recorded upon the start of each case, this increased monthly orthodontic revenues by $100,000[3] (and to approximately $150,000 per month starting in March 2022). The Founders, Alegre and Dr. Sohrab had thus accomplished the goal of increasing revenues and the growth trajectory of the orthodontic business.

63.    However, collections on these IHF cases tumbled immediately, from a collections rate of 91% to 75% or less. Nonetheless, from November 2021 to the Closing, WCD, Inc. did not increase its bad debt allowance in its income statements referenced in the Purchase Agreements and included in the Disclosure Schedule, despite the major drop in collections. On the contrary, Defendants continued to

---

[3] As explained under Section D(2) below, commencing in March 2022 the Company changed its accounting methods and thus increased the revenue recorded upon the start of an orthodontic case to approximately $2,196, representing an $800 increase. Hence, not only did WCD, Inc. record higher revenues due to the increased volume of IHF cases, but it also increased the amount of revenue recorded per case by an additional $800. Hence, the increased revenues starting in March 2022 grew to approximately $150,000 per month.

represent that the collections rate had remained at the high 91% level.

64.     By March 2022 or earlier, however, the Founders, Alegre and Dr. Sohrab had been informed by WCD, Inc. accounting staff that collections had tumbled and hence they knew of the problem but made no disclosure to Plaintiffs of this material information and did not increase the allowance for uncollectible accounts receivable and bad debt expense.  On the contrary, they continued to represent in the subsequent WCD Offering Documents that the orthodontic business was growing rapidly, that increasing amounts of IHF contracts were being written, and that collections on the IHF contracts remained at historically high levels.

65.     Nor did the Founders, Alegre or Dr. Sohrab disclose in the WCD Offering Documents, the other documents and materials delivered to Court Square, or in the meetings that took place between these Defendants and Court Square, that the WCD Entities had essentially abandoned their extensive creditworthiness and underwriting criteria for extending IHF credit to patients.  Commencing in November 2021 and continuing through the Closing at the behest of the Founders and the Officers the Practice Entities materially changed their long-standing practice of, among other things, requiring at least $300 in down payments, monthly payments that averaged $175, proof of employment and earnings, and imposing a maximum term of 22 months, such that none of these safeguards were included in the new $99/$99 IHF option on all new orthodontic cases.4  The information provided to Court Square continued to state that collections on the IHF cases was proceeding at the historical 91% rate and did not disclose any of these material changes relating to extension of IHF credit.

66.     With the 99/99 Fraud the Founders and the Officers knowingly and

---

4 Indeed, in a Management Presentation offering supplement dated March 1, 2022 that was prepared by Alegre and Dr. Sohrab and approved by the Founders, the parties stated that the $99/$99 down payment and installment terms had been offered on a promotional basis only, and did not disclose that the credit qualification conditions had been abandoned.

22

COMPLAINT

intentionally collaborated and conspired to materially and secretly deviate from past business practices and allow the WCD Entities to extend IHF credit to patients who could not afford braces and who would not have qualified for IHF under the long-standing prior business practices.  The 99/99 Fraud was carried out for the express purpose of creating the false illusion of increased revenues, profits and growth in the orthodontics business.

67.    Neither the Founders, Dr. Sohrab, Alegre or any other person disclosed the 99/99 Fraud prior to the Closing.  Rather, they concealed the 99/99 Fraud, the substantial increase in defaults, and the Company's material changes in its business practices and accounting policies—all in order to conceal from Plaintiffs the true state of the WCD Entities' revenues, profits, collections and growth trajectory.

        2.    *The RevRec Fraud: Starting in March 2022, Defendants Materially Increased the Amount of Revenue Recognized in the Company's Income Statements for Orthodontics Starts Without Disclosing This Accounting Change, Thus Creating the False Appearance of Revenue Growth (the "RevRec Fraud").*

68.    According to accounting staff at WCD, Inc., in early 2022 and for many months before then, the Founders, Alegre and Dr. Sohrab had discussed the idea of increasing the dollar amount of revenue recognized in the WCD Entities' income statements upon the start of new orthodontic cases as a means of showing increasing revenues and profits, but without increasing the price of the cases.  In their discussions before early 2022, they had decided not to change the long-standing policy of recognizing approximately $1,396 in revenues in the income statement upon the start of an orthodontic case, and recognizing the remaining $2,604 as revenues in equal monthly increments over the expected treatment life of the orthodontic case (for an average case that was priced at $4,000).  Hence, for a case that cost the patient a total of $4,000 and had an expected treatment life of 24 months, the WCD Entities would recognize $1,396 of revenue in its income

1  statement upon the start of the case, and $108.50 per month over a 24-month period

2  (108.50 x 24 = $2,604).

3      69.    In early 2022 the Founders, Alegre and Dr. Sohrab were concerned that

4  the increased number of orthodontic cases from the 99/99 Fraud had levelled off and

5  the orthodontic business was not showing continuing growth.  To address this, they

6  revisited their earlier discussions regarding the revenue recognition policy and

7  decided that the WCD Entities would increase the dollar amount of revenue

8  recognized upon the start of an orthodontic case to approximately $2,196 from

9  $1,396, representing an $800 per case increase, but without increasing the case price

10  (the "RevRec Fraud").  As they were starting approximately 450–500 orthodontic

11  cases per month, this would produce an increase of $360,000 to $400,000 in monthly

12  revenues with nearly all of it also increasing net profits and creating an appearance

13  of continuing growth in the orthodontics business, but without actually increasing

14  the prices of the cases or the number of cases or the trajectory of the business.

15      70.    The Founders, Alegre and Dr. Sohrab agreed and the RevRec Fraud

16  was implemented in March 2022.  It continued through to the Closing.

17      71.    Between March and June 2022, the RevRec Fraud added more than

18  $1,114,000 in revenues, nearly all of which increased net income in the financial

19  statements presented to Court Square and Plaintiffs.  However, this material change

20  in operating practices and accounting methods was not disclosed to Court Square or

21  Plaintiffs and resulted in a material overstatement of the WCD Entities' revenues,

22  profits, accounts receivable and growth trajectory with regard to their orthodontics

23  business.

24      72.    To facilitate recognition of the additional $800 per orthodontic case

25  under the RevRec Fraud, Alegre instructed his accounting staff to change the coding

26  system used in the Company's accounting records for orthodontic cases.

27  Specifically, whereas the Company had been using codes 0330, 0340, 0350, 0470,

28  8999, 8080/8080A, and 8090/8090A (together, the "Original RevRec Codes") before

the March 2022 RevRec Fraud to record orthodontics revenues, in March 2022 Alegre instructed his accounting staff to add codes 8080B, 8090B, and 8060B30 (together, the "New RevRec Codes") which would be used to recognize the additional $800 upon the start of new orthodontic cases.  The case prices did not change, and no new work was intended to be, or was in fact being, performed that would correspond with these new shell codes.

73.     Hence, during March through June 2022, the same time as the Founders, Alegre and Dr. Sohrab were in deep discussions and negotiations with Court Square, they were also manipulating the revenues, profits and growth trajectory being reported to Court Square by means of the 99/99 Fraud and the RevRec Fraud.

3.    *Defendants Secretly Changed the Company's Accounting Method for Calculating The Allowance For Doubtful Accounts and Bad Debt Starting in December 2021 (the "Bad Debt Fraud").*

74.     Commencing in December 2021 and continuing through June 30, 2022, Defendant Alegre made material undisclosed changes to the accounting method for calculating the monthly allowance for doubtful accounts receivable and bad debt expense.

75.     Before December 2021, the methodology involved aging the accounts receivable into thirty-day age groups up to a final age group of 180+ days (*e.g.*, age groups of 0-30, 31-60, and so forth) split into two categories (*i.e.*, Non-Ortho and Ortho).  The accounting department then applied different bad debt percentages to each of the aging groups (the percentages increased as the age groups got older) by category and derived what it determined to be the appropriate allowance for doubtful accounts and bad debt expense.

76.     Specifically, Alegre lowered the bad debt percentages for the newly created third category (*i.e.*, IHF for both Non-Ortho and Ortho).

77.     In December of 2021, Alegre decided to change the methodology—*i.e.*,

25

he split the accounts receivable into three categories (*i.e.*, Non-Ortho, Ortho and IHF) and changed both the age groups and the bad debt percentages that were applied to the age groups—for purposes of calculating the allowance for doubtful accounts receivable and the associated bad debt expense.

78.    Specifically, Alegre expanded the age groups in thirty-day increments up to a final group of 720+ days, whereas previously the maximum age group was 180+ days.  Alegre next applied different but lower percentages to several of the overlapping age groups (*i.e.*, the age groups that were the same as the pre-change groupings), and he applied new percentages to the new longer-ranging age groups (*i.e.*, from 210 days and longer, up to the final group of 720+ days).

79.    Those accounting changes were neither consistent with "Agreed Accounting Principles" represented and warranted in the Purchase Agreements (*see* Ex. A paragraphs 4.05(a) and 11.01), nor were they disclosed in any of the WCD Offering Documents or in any other materials or meeting with Court Square.

80.    Alegre's new methodology was applied sporadically and inconsistently between December 2021 and June 2022.  Thus, for example, in February 2022 the new method called for a reduction of several hundred thousand dollars in the allowance for uncollectible accounts receivable and bad debt expense.  Alegre instructed his accounting staff to record the changes in the February 2022 financial statements, thus materially reducing bad debt expense and increasing net income.  Nothing was recorded in March 2022.  Then, for the months of March and April 2022 the new methodology called for a combined increase of approximately $1 million in the allowance for doubtful accounts receivable and associated bad debt expense, but Alegre instructed his accounting staff to not record anything for those months.  Alegre's changes and sporadic application and ignoring of the new methodology went undisclosed.  This non-disclosure was material to the integrity and understanding of the income statements and balance sheets provided to Court Square and included in the EPA and the Disclosure Schedule.

1          *4.          The $500K Fraud: Defendants Knowingly Overstated Collections
2                    and Understated Bad Debt by Reflecting $500,000 as Having
3                    Been Collected in Its Books and Records that Was Never
4                    Collected and Had Been Outstanding for at Least 6 Months
5                    Before the Closing.*

6          81.     In the ordinary course of West Cost Dental's business, the Practice

7    Entities historically and customarily had reconciling items on their bank

8    reconciliations.  The reconciling items commonly included deposits-in-transit from

9    third-party patient financing companies, which represented payments recorded in the

10   Practice Entities accounting records as having been received, but where the monies

11   had not yet been deposited into the bank accounts of the Practice Entities.  The

12   Founders and Alegre concealed from Plaintiffs that there had been approximately

13   $500,000 in deposit-in-transit reconciling items in the bank reconciliations that

14   related to the 2020 and 2021 calendar year business of the Practice Entities, but that

15   had never been collected.  Thus, they should have been written off before the

16   Closing under ordinary accounting practices, but they were not.  (They were all

17   written off post- Closing once new management discovered them.)

18         82.     Had this $500,000 been written off before the Closing as was

19   appropriate under WCD, Inc.'s ordinary and historical accounting practices, the

20   accounts receivable and net income represented in the financial statements included

21   in the Purchase Agreements, and as to which Representations and Warranties were

22   made, would have been lower by approximately $500,000.  However, the Founders

23   and Alegre chose to omit these facts and instead concealed them from Plaintiffs.

24   **E.     Undisclosed and Misrepresented to Plaintiffs, the Founders and**

25   **Alegre Knowingly Prepared and Filed False PPP Loan**

26   **Applications With the SBA.**

27         83.     The Founders and Alegre knowingly caused seven applicants—*i.e.*,

28   WCD, Inc. and six of the Practice Entities (all seven parties are referred to herein as

27

COMPLAINT

the "**Seven WCD Affiliated Borrowers**," while the six borrowing Practice Entities are referred to as the "**Six Practice Entity Borrowers**")—to file false applications in February and March 2021 with the SBA (the "**Loan Applications**") for approximately $4 Million in PPP loans (the **"$4 Million 2021 PPP Loans**").  The Founders and Alegre knowingly failed to disclose to Plaintiffs that Alegre had intentionally misstated the information in the Loan Applications of all Seven WCD Affiliated Borrowers when preparing them, and that the Founders had signed and filed them with knowledge that they were false and inaccurate.

84.    As a result of a False Claims Act investigation by the DOJ and a whistleblower lawsuit alleging that the $4 Million 2021 PPP Loans were obtained with knowledge that the Loan Applications were false, in 2024 the Founders returned the $4 Million 2021 PPP Loans and also paid the DOJ an additional $2.3 million, representing a total of approximately $6.3 million, in settlement of the FCA claims and the whistleblower lawsuit.

85.    In preparing the Loan Applications Alegre falsely and incorrectly stated the number of employees of the Seven WCD Affiliated Borrowers.  He also knowingly omitted required information regarding the affiliation of WCD, Inc. and the Practice Entities, thus rendering the Loan Applications further false and inaccurate.  Drs. Pakravan and Cohen knew that the Loan Applications were all false and inaccurate, yet signed them and instructed that they be filed with the SBA.

86.    Copies of the Loan Applications were referenced in the Purchase Agreements and the Disclosure Schedule.  The Representations and Warranties in the Purchase Agreements expressly stated that all documents provided with regard to the $4 Million 2021 PPP Loans were "true, correct and complete."  (*See* Ex. A paragraph Par. 4.05(c)).  That was false and was not disclosed to Plaintiffs.

87.    Based on information that Alegre and Dr. Pakravan had obtained from WCD, Inc.'s outside accountants, both of them knew that all of the Loan Applications were false and inaccurate.  Alegre had numerous telephonic and written

28

COMPLAINT

communications with the Company's external accountants and banking advisors regarding the $4 Million 2021 PPP Loans before they were filed with the SBA.  Dr. Pakravan also had such communications with outside accountants and advisors.  The outside accountants wrote to Alegre and Dr. Pakravan, telling them that WCD, Inc. and all of the Practice Entities were "affiliates" under the SBA rules and as such were required to aggregate the number of employees all of them had (approximately 690 employees when aggregated) in applying for PPP loans.  They were further advised that since their aggregated number of employees exceeded the maximum allowable limit of 300, they did not qualify under that criterion.

88.    However, although armed with this knowledge, Alegre did not aggregate the employees of the Seven WCD Affiliated Borrowers in the Loan Applications for the $4 Million 2021 PPP Loans.  Instead, in the Loan Applications of each of the Seven WCD Affiliated Borrowers, Alegre stated only the number of employees of the respective applicant entity, each of which was under 300.  Moreover, in the Feb-Mar 2021 Applications of each of the six Practice Entity Borrowers Alegre intentionally failed to disclose that each had affiliates (despite the fact that the applications asked that question specifically).

89.    In addition, in preparing the Loan Application for WCD, Inc., Alegre reported that WCD, Inc. did have affiliates (*i.e.*, the Practice Entities), but he falsely stated that the number of employees was only 131.  That represented WCD, Inc.'s disaggregated number of employees only, even though he was required to report the aggregated number with all of the Practice Entities.  He thus omitted in the WCD, Inc. Loan Application the approximately 560 employees of the Practice Entities.

90.    The Founders and Alegre knew that they were required to report the affiliation between WCD, Inc. and the Practice Entities.  In fact, on March 23, 2021 (just weeks after WCD, Inc. had filed its Loan Application stating that it had only 131 employees), WCD, Inc. filed a different PPP application with the SBA—this one for forgiveness of the $7.3 million in PPP loans (the "$7.3 Million March 2021

29

COMPLAINT

Forgiveness Application") that WCD, Inc. had obtained one year earlier in April 2020 (the "$7.3 Million 2020 Loan").  Alegre prepared, signed and filed the $7.3 Million March 2021 Forgiveness Application.  It stated that WCD, Inc. had (a) affiliates and (b) an aggregate of 697 employees.  Yet just weeks earlier (February 12, 2021) WCD, Inc. had reported only 131 employees in its Loan Application for its share of the $4 Million 2021 PPP Loans.  Alegre nevertheless chose to report the aggregated 697 employee number in the $7.3 Million March 2021 Forgiveness Application for WCD, Inc. because that high number was necessary in order to obtain forgiveness of the entire $7.3 Million 2020 Loan.

**F.    The Founders, Frontier Holdco, and the Officers Caused WCD, Inc. To Make False Representations in the EPA To Conceal Their Artificial Inflation of the Company's Revenue, Profits and Growth Trajectory, and The PPP Fraud.**

91.    Under the EPA, the Founders, Frontier Holdco, and the Officers caused WCD, Inc. to make, conspired to cause WCD, Inc. to make, or aided and abetted each other and WCD, Inc. to make several false Representations and Warranties in the EPA, on which Court Square and Plaintiffs relied, to induce Plaintiffs to purchase the Shares.  Dr. Pakravan executed the EPA on behalf of WCD, Inc.

92.    The Founders, Defendant Shareholders, Frontier Holdco, and the Officers, as agents for one-another and working in concert on all material aspects of the business and operations of WCD, Inc. and the Practice Entities, including in connection with the sale of the Shares, knew of the misstatements and omissions of material facts in the Representations and Warranties contained in the EPA and otherwise in connection with the sale of the Shares.  Such knowledge on the part of the Founders, Defendant Shareholders, and the Officers derived from the Founders' positions as Directors of WCD, Inc. and the Practice Entities, the Officers' positions as high ranking officers of WCD, Inc. (CEO and CFO), and the Founders' status and positions as the controlling shareholders of WCD, Inc. and the Practice Entities and

the significant involvement of Drs. Pakravan and Cohen in all material aspects of the business and operations of WCD, Inc. and the Practice Entities.

93.    The Founders and Defendant Shareholders and thus Frontier Holdco, as their agent, together with the Officers, knowingly or recklessly caused WCD, Inc. to make materially false representations and warranties inasmuch as they had ample access to information concerning and were the decision-makers with respect to all important aspects of the business, operations and affairs of WCD, Inc. and the Practice Entities. They had ample access to all employees, records and consultants of WCD, Inc. and the Practice Entities to satisfy themselves as to, and to ensure, the accuracy of the Representations and Warranties in the EPA and the information otherwise disclosed and omitted in connection with the sale of the Shares, but nonetheless proceeded with the transaction with knowledge of some or all of the misstatements and omissions relating to the PPP Fraud, the 99/99 Fraud, the RevRec Fraud, the Bad Debt Fraud, the $500K Fraud, and the Calimesa Fraud.

94.    Considering the substantial changes in WCD, Inc's business, operations, practices and accounting policies and methods shortly before entering into the EPA, the Founders and Officers had ample reason to confirm with the employees of WCD, Inc. and the Practice Entities and all appropriate consultants that such representations and warranties did not contain any material misstatements or omissions. The Founders and Officers knowingly or recklessly failed to do so. All such misrepresentations and omissions had the effect of inflating the Purchase Price for the Shares by causing West Coast Dental to appear more valuable than it was.

1.    *The Representations and Warranties In Paragraph 4.05(a) of the EPA Relating To the Financial Statements Referenced Therein Were Materially False and Misleading.*

95.    Section 4.05(a) of the EPA states as follows:

Attached as Schedule 4.05 of the Disclosure Schedule are true, correct and

complete copies of (i) the audited consolidated balance sheet and the related statements of income, stockholder's equity and cash flows of the Target Companies and their Subsidiaries as of and for the fiscal years ended December 31, 2020 and December 31, 2019 and the unaudited consolidated balance sheet and the related statements of income, stockholder's equity and cash flows of the Target Companies and their Subsidiaries as of and for the fiscal year ended December 31, 2021 (the "Annual Financial Statements"), and (ii) the unaudited consolidated balance sheet of the Target Companies and their Subsidiaries as of April 30, 2022 (the "Latest Balance Sheet") and the related statements of income, stockholder's equity and cash flows of the Target Companies and their Subsidiaries for the four (4)-month period ended April 30, 2022 (the "Interim Financial Statements" and collectively with the Annual Financial Statements, the "Financial Statements"). ***The Financial Statements*** (A) ***fairly present, in all material respects the financial position of the Target Companies and their Subsidiaries as at the dates and for the periods covered thereby***, (B) are consistent in all material respects with the books and records of the Target Companies and their Subsidiaries and (C) ***have been prepared in accordance with the Agreed Accounting Principles***, except that the Financial Statements do not contain footnote disclosures and other presentation items and the Interim Financial Statements do not reflect year-end adjustments (none of which footnotes, presentation items or adjustments relate to a violation of Contract or Law or which would, alone or in the aggregate, be materially adverse to the operations, assets, liabilities, financial condition, operating results or cash flows of the Target Companies and their Subsidiaries).

96.    The EPA defines the "Agreed Accounting Principles" as:

GAAP, ***applied consistently with historical past practices***; provided, however, that if more than one methodology exists for calculating asset and liability balances under GAAP, ***the methodology employed will be based on the generally accepted accounting principles applied in preparation of the Company's Financial Statements dated as of December 31, 2021.***

Ex. A § 11 (emphasis added).

97.    Schedule 4.05 to the EPA included the referenced Financial Statements. However, due to the PPP Fraud, the 99/99 Fraud, the Bad Debt Fraud and the Calimesa Fraud, those Financial Statements did not fairly present in all material respects the financial position of WCD, Inc. and were not prepared in accordance with the Agreed Accounting Principles.

98.    Section 4.05(a) of the EPA thus constitutes a fraudulent misrepresentation, made by the Founders, Frontier Holdco, and the Officers on June 1, 2022.

COMPLAINT

2. *The Representations and Warranties In Paragraph 4.05(b) of the EPA Relating To the Financial Statements Referenced Therein Were Materially False and Misleading.*

99. Section 4.05(b) of the EPA states as follows:

The Target Companies have established and maintained, and currently maintain, a system of internal accounting controls sufficient to provide reasonable assurances that (i) transactions are executed in accordance with its management's general or specific authorizations in all material respects, (ii) *transactions are recorded in conformity with the Agreed Accounting Principles and applicable Law*, (iii) access to assets is permitted only in accordance with management's general or specific authorization, and (iv) the recorded accountability for assets is compared with the existing assets at a reasonable intervals and appropriate action is taken with respect to any differences.

100. By virtue of the PPP Fraud, the 99/99 Fraud, the Bad Debt Fraud, the $500K Fraud, and the Calimesa Fraud, WCD, Inc. did not have sufficient controls to record transactions in accordance with the Agreed Accounting Principles.

101. Section 4.05(b) of the EPA thus constitutes a fraudulent misrepresentation, made by the Founders, Frontier Holdco, and the Officers on June 1, 2022.

3. *The Representations and Warranties In Paragraph 4.05(c) of the EPA Relating To the Financial Statements Referenced Therein Were Materially False and Misleading.*

102. Section 4.05(c) of the EPA states as follows:

Except as set forth on Schedule 4.05(c) of the Disclosure Schedule, the Seller Parties have made available to Buyer true, correct and complete copies of all applications, forms and other documents filed or submitted by the Target Companies (or any Representative thereof) relating to the Stimulus Funds, *and all statements and information contained in such applications, forms and other documents are true, correct and complete.* All funds received in respect of the Stimulus Funds have been used by the Target Companies in compliance with applicable Law and all applicable terms and conditions or are being held for use in the bank accounts of Target Companies. . . . No act or failure to act on the part of any Target Company or any other Person has resulted or *will result in the failure of any Stimulus Funds eligible for forgiveness, if applicable, under any applicable Law to be so forgiven in accordance with the applicable Law and all applicable terms and conditions, or if forgiven, to have such forgiveness rescinded.*

33

COMPLAINT

103.   By virtue of the PPP Fraud, contrary to this representation, as set forth above, the Founders, on behalf of the WCD, Inc. and certain Practice Entities, knowingly submitted applications, and Alegre, on behalf of WCD, Inc., knowingly prepared applications, for Stimulus Funds, *i.e.*, PPP loans, that contained false and untrue information, which resulted in a *qui tam* whistle-blower suit against WCD, Inc., the Founders and certain Practice Entities, for which the Founders ultimately agreed to pay restitution of the wrongfully received PPP loans.

104.   Section 4.05(c) of the EPA thus constitutes a fraudulent misrepresentation, made by the Founders, Frontier Holdco, and the Officers on June 1, 2022.

> *4.     The Representations and Warranties In Paragraph 4.05(d) of the EPA Relating To the Financial Statements Referenced Therein Were Materially False and Misleading.*

105.   Section 4.05(d) of the EPA states:

The accounts receivable of the Target Companies reflected on the Latest Balance Sheet and any accounts receivable generated after the date of the Latest Balance Sheet ***have been valued in accordance with the Agreed Accounting Principles***, were generated in the operation of the businesses of the Target Companies and represent valid receivables arising from bona fide sales or services made or provided in the Ordinary Course of Business, and are not subject to any valid defenses, set-offs or counterclaims, and no Target Company is involved in any Proceeding regarding any accounts receivable. ***All outstanding accounts receivable deemed uncollectible have been reserved against on the Financial Statements in accordance with the Agreed Accounting Principles.*** Since the date of the Latest Balance Sheet, there have not been any write-offs as uncollectible of any accounts receivable of the Target Companies, except for adjustments or credits in the Ordinary Course of Business.

106.   By virtue of the PPP Fraud, the 99/99 Fraud, and the Bad Debt Fraud, contrary to this representation, and as more fully set forth above, the Founders, Frontier Holdco, and the Officers caused WCD, Inc. to knowingly and artificially inflate the value of receivables on its Latest Balance Sheet in a manner not in conformity with the Agreed Accounting Principles.

107.   The Defendant Founders, for themselves, Frontier Holdco, and the

34

COMPLAINT

remaining Selling Shareholders, directed and authorized such actions in order to increase the perceived value of WCD, Inc. and the Purchase Price for the Shares.

108.   Section 4.05(d) of the EPA thus constitutes a fraudulent misrepresentation, made by the Founders, Frontier Holdco, and the Officers on June 1, 2022.

### 5.    *The Representations and Warranties In Paragraph 4.06 of the EPA Relating To the Financial Statements Referenced Therein Were Materially False and Misleading.*

109.   Section 4.06 of the EPA states:

No Undisclosed Liabilities.  Except as set forth on Schedule 4.06 of the Disclosure Schedule, no Target Company has any liabilities or obligations except for (a) liabilities reflected on and adequately reserved against in the Interim Balance Sheet, (b) liabilities incurred in the Ordinary Course of Business since the date of the Interim Balance Sheet (none of which relates to a breach of Contract, breach of warranty, tort, infringement or violation of Law or Order or would, alone or in the aggregate, be materially adverse to the operations, assets, liabilities, financial condition, operating results or cash flows of the Company or any of the Target Companies) and (c) Transaction Expenses.

110.   By virtue of the PPP Fraud and the RevRec Fraud, contrary to this representation, and as more fully set forth above, the Founders and Allege caused WCD, Inc. and certain Practice Entities to have undisclosed liabilities.

111.   Section 4.06 of the EPA thus constitutes a fraudulent misrepresentation, made by the Founders, Frontier Holdco, and the Officers on June 1, 2022.

### 6.    *The Representations and Warranties In Paragraph 4.07 of the EPA Relating To the Financial Statements Referenced Therein Were Materially False and Misleading.*

112.   Section 4.07 of the EPA states:

Absence of Certain Developments.  Except as expressly contemplated or permitted by this Agreement or as set forth on Schedule 4.07 of the Disclosure Schedule, since the date of the Latest Balance Sheet, (i) the Target Companies have conducted their respective businesses only in the Ordinary Course of Business and (ii) there has not occurred a Material Adverse Effect.  Without limiting the foregoing, since March 31, 2022: . . . (k) there has not been any change by any Target Company in its

35

COMPLAINT

1    accounting or Tax reporting methods, principles, policies or practices;

2    113.  By virtue of the PPP Fraud, the 99/99 Fraud, the Bad Debt Fraud, the

3    $500K Fraud and the Calimesa Fraud, contrary to this representation, and as more

4    fully set forth above, the Founders, and the Officers caused WCD, Inc. to have an

5    undisclosed change to the ordinary course of business.

6    114.  Section 4.07 of the EPA thus constitutes a fraudulent misrepresentation,

7    made by the Founders, Frontier Holdco, and the Officers on June 1, 2022.

8       7. *The Closing Certificate Reiterated These False Representations*

9        *and Warranties on July 1, 2022, and Thus Constituted a Further*

10       *Fraudulent Misrepresentation or Omission.*

11   115.  Under Section 2.03(b)(ii) of the EPA, Frontier Holdco, through Dr.

12   Pakravan, and on behalf of the other Founders and Defendant Shareholders,

13   delivered a Seller Closing Certificate to Plaintiffs dated July 1, 2022.

14   116.  The Seller Closing Certificate fraudulently represented the following:

15   The representations and warranties of the Seller Parties and the Company
     set forth in Section 3.02 and Article IV of the Purchase Agreement,
16   respectively, other than the Fundamental Representations, each interpreted
     without giving effect to any limitation or qualification as to "Material
17   Adverse Effect", "material", "materiality", "material adverse effect" or
     similar standard or qualification, were true and correct in all respects as of
18   the date of the Purchase Agreement and are true and correct in all respects
     as of the date hereof (except to the extent made with reference to an earlier
19   date, in which case such representations and warranties were true and
     correct in all respects as of such earlier date), in each case, except where
20   the failure of such representations and warranties to be so true and correct
     did not have and would not reasonably be expected to have, individually
21   or in the aggregate, a Material Adverse Effect.

22   117.  The Seller Closing Certificate of the EPA thus constitutes a fraudulent

23   misrepresentation, made by the Founders and Frontier Holdco on July 1, 2022,

24   because the Representations and Warranties of WCD, Inc. were not true and correct

25   in all respects as of the date of the EPA.

26

27

28

36

COMPLAINT

**G.    The Founders and Officers Further Concealed Their Artificial Inflation of West Coast Dental's Revenues Through False Representations in the WCD Offering Documents.**

118.    The Founders and Officers not only caused WCD, Inc. to make false Representations and Warranties in the EPA, but they also caused WCD, Inc. to make false representations in the WCD Offering Documents and in the Virtual Data Room for due diligence on the transaction.

119.    Specifically, by virtue of the PPP Fraud, the 99/99 Fraud, the Bad Debt Fraud, the $500K Fraud, and the Calimesa Fraud, the Offering Documents and other materials in the Virtual Data Room contained false representations and omissions.

120.    None of the WCD Offering Documents disclosed the true facts regarding the business, affairs, transactions and accounting impacts of the PPP Fraud, the 99/99 Fraud, the Bad Debt Fraud, the $500K Fraud, and the Calimesa Fraud.

121.    The Founders caused West Coast Dental to issue the CIP to Court Square on January 19, 2022, for which they wrote and collectively signed an opening letter to "potential growth partners" outlining their business strategy.

122.    Page 22 of the CIP represented that WCD, Inc. offers both "in-house & Third-Party Financing."

123.    Page 24 of the CIP mentioned WCD, Inc.'s "[e]xpansion of in-house credit and third-party financing provide additional options for patients."

124.    Page 34 of the CIP represented that WCD, Inc.'s support personnel had facilitated an increase in the "number of in-house contracts *when 3rd party is not an option resulting in case acceptance expansion*" (emphasis added).

125.    The CIP omitted any reference to the true facts, business and operating practices, and accounting effects of the 99/99 Fraud, the Bad Debt Fraud, the $500K Fraud, or the PPP Fraud, all of which occurred before and were still ongoing at the time that West Coast Dental circulated the CIP to Court Square.

126.   In a December 3, 2022 Financial Due Diligence Report, created by an outside consulting group commissioned by West Coast Dental in connection with analysis of its financial performance and with marketing its sale, the Report stated on page 12 that "[i]n-house financing is only available to patients that do not qualify for" a third-party financing program.  West Coast Dental provided that report to Court Square with the CIP.  However, under the deceitful practices of the 99/99 Fraud, this was materially false and misleading.

127.   On March 3, 2022, West Coast Dental presented to Court Square a Management Presentation with a PowerPoint slide deck with additional information on the Company and its finances (the "**Management Presentation**").

128.   On page 6 of the Management Presentation, WCD, Inc. represented that it offered a "[m]ix of 3rd party and internal financing solutions with outstanding collection performance."

129.   On page 17 of the Management Presentation, WCD, Inc. represented that it "[o]ffers Installment Plan & Third-Party Financing."

130.   On page 19 of the Management Presentation, WCD, Inc. represented that an "[e]xpansion of installment plan and third party financing provide additional options for patients."

131.   On page 35 of the Management Presentation, WCD, Inc. represented that its back office changes led to "[i]ncreases [in] number of installment plan contracts *when 3rd party is not an option resulting in case acceptance expansion*" (emphasis added).

132.   The Management Presentation, however, also omitted any reference to the true business and operating practices, as well as the accounting impacts, of the 99/99 Fraud and the Bad Debt Fraud, which at that point the Company had implemented for months.

133.   The Company also provided to Court Square in connection with the Management Presentation a separate presentation, which provided additional details

regarding West Coast Dental (the "**Supplemental Materials**").

134.   On page 14 of the Supplemental Materials, WCD, Inc. presented a slide called "Revenue Cycle Management: Installment Plan Financing (In-House Financing)," which stated that WCD, Inc. has a process for IHF that includes "a soft credit-check" to verify the "patient's address and credit history."

135.   The same page of the "Supplemental Materials" stated "Typical Financing" for Orthodontics was "30% down, up to 24 month payments," with a note of a "current special of $99 down, $99 per month."

136.   The Supplemental Materials did not mention any of the true facts concerning the 99/99 Fraud.

137.   As a result of these representations and omissions, Plaintiffs had no knowledge of WCD, Inc.'s material deviation from its historical practices with respect to providing IHF as detailed above.

**H.    The Founders and Officers Knowingly or Recklessly Caused WCD, Inc. to Make False Representations in the EPA and WCD Offering Documents.**

138.   Having founded West Coast Dental in 1991 and owning and controlling, directly or indirectly, all of the voting shares of stock of WCD, Inc. and the Practice Entities, which operated as S-corps., and as the controlling directors, executives and decision-makers, the Founders remained intimately involved in the operations and finances of WCD, Inc. and the Practice Entities prior to its acquisition.  Alegre and Dr. Sohrab, as executive officers of WCD, Inc. with involvement in all major aspects of the operations of WCD, Inc. and the Practice Entities, as well as their frequent collaboration with the Founders, remained deeply involved in the operations and finances of WCD, Inc. and the Practice Entities prior to the acquisition.

139.   As WCD, Inc. and the Practice Entities operated as S-corps., all gains and losses of those entities passed through directly to the Founders and the Other

1    Shareholders that they directly or indirectly controlled, which thus necessitated their

2    awareness and approval of all material business decisions of WCD, Inc. and the

3    Practice Entities.

4         140.   Prior to the Closing, the Founders were still the sole Directors of WCD,

5    Inc, to whom all of its officers ultimately reported.  The Founders served as the

6    executive decision-makers of WCD, Inc. and the Practice Entities at all relevant

7    times with regard to Plaintiffs' claims herein.  Dr. Sohrab was hired as the Chief

8    Executive Officer of WCD, Inc. in 2016 and in that capacity had deep involvement

9    in all aspects of its business and operations and collaborated and communicated with

10   the Founders on an ongoing and frequent basis.

11        141.   The Founders hired Alegre as a full-time CFO in 2020, shortly before

12   they began again to prepare in earnest to sell West Coast Dental to an outside buyer.

13        142.   The Founders maintained offices at WCD, Inc.'s headquarters in close

14   proximity to Defendant Alegre and other officers and accounting staff of WCD, Inc.

15        143.   Having initiated the process for selling West Coast Dental in 2021, and

16   as direct and indirect recipients of the benefits of the sale of WCD, Inc., the

17   Founders repeatedly stressed to the Officers the need to maximize revenue and

18   EBIDTA to increase the value of the business and therefore the Purchase Price for

19   the Shares in a sale.

20        144.   The Founders had a direct motivation to make WCD, Inc. appear more

21   valuable, since they stood to benefit from its sale as shareholders (both personally

22   and as Trustees of or relatives of the Other Shareholders) of WCD, Inc.

23        145.   The Founders certainly understood the importance of the information in

24   the CIP and other marketing materials provided to Court Square, having all three of

25   them signed a two-page opening letter in the CIP detailing the virtues of the

26   business, including "financial and operational reporting," which they represented as

27   "***the most comprehensive and granular reporting packages in the industry***"

28   (emphasis added).

146.   As the recipients of such "comprehensive and granular reporting
packages," as well as routine communications with the Officers and WCD, Inc.
executives and staff, the Founders knew or should have known about (1) the 99/99
Fraud, (2) the RevRec Fraud, (3) the Bad Debt Fraud, (4) and the $500K Fraud.

147.   Likewise, the Founders knew or should have known that all four items
had the impact of increasing West Coast Dental's reported revenue and would thus
drive up the purchase price for the Shares.

148.   The Founders, having a vested interest in the sale of their business and
access to all of the information West Coast Dental provided to Court Square in its
marketing materials and the data room, either knew or should have known that such
disclosures contained the false representations and omissions detailed herein.

149.   The Founders, accordingly, played a direct role in approving WCD,
Inc.'s Representations and Warranties in the Equity Purchase Agreement, being the
*de facto* sellers of all the Shares, and signatories to the EPA.  Indeed, Dr. Pakravan
also executed the EPA on behalf of WCD Inc.

**I.     The Officers Also Caused WCD, Inc. to Make Knowingly False or
Misleading Statements and Representations.**

150.   Defendant Alegre, as WCD, Inc.'s CFO, prepared the financial
statements and reports issued to Court Square.

151.   Alegre determined West Coast Dental's revenue recognition and bad
debt expense policies in order to prepare the financial statements of WCD, Inc. and
the Practice Entities.

152.   As the CFO, Alegre received regular reports regarding West Coast
Dental's collections on IHF contracts, aging receivables reports, and West Coast
Dental's revenue.

153.   Defendant Dr. Sohrab, the Company's CEO, oversaw Defendant Alegre
and had primary responsibility for authorizing, with approval from the Founders,
material changes in WCD's operations, such as the $99/$99 Program.

154.   As the CEO, Dr. Sohrab also received regular reporting on West Coast Dental's collections on IHF contracts, aging receivables reports, and its revenue.

155.   Both Officers assisted in the preparation of West Coast Dental's marketing materials and financial reporting to Court Square during due diligence.

156.   Therefore, both Officers would have or should have known that the marketing materials and other disclosures during the due diligence period made the fraudulent misrepresentations and omissions detailed herein.

157.   The Officers understood and complied with the Founders' directive to inflate West Coast Dental's earnings through the various frauds identified herein and thus the Purchase Price for the Shares.

**J.      Plaintiffs Reasonably and Justifiably Relied on the False Representations and Omissions.**

158.   Court Square's agents formed Buyer, Inc. and Parent, LLC for the purpose of entering into the Purchase Agreements.

159.   Buyer, Inc. and Parent, LLC, therefore, relied on all information provided by West Coast Dental through the Founders, Officers, and other agents to Court Square.

160.   In February 2022, Court Square signaled its interest in purchasing West Coast Dental with a letter of intent and a preliminary bid.

161.   In response, the Founders and the Officers portrayed West Coast Dental as consistently growing, although they evidenced that portrayal through the fraudulent representations and omissions with respect to the frauds detailed herein, rather than actual evidence of growth.

162.   From March 2022 through June 2022, Court Square made several bids in a competitive bidding environment, increasing the bids each time.

163.   Court Square's March 2022 internal investment committee memo noted that the growth potential of West Coast Dental represented meaningful upside to the transaction.

42

COMPLAINT

164.    Court Square made those bids, including a bid for the ultimate Purchase Price, by explicitly incorporating the misstatements and omissions from the marketing materials, pitch decks, confidential memoranda, financial statements, and other information subject to the Representations and Warranties into its valuation methodology.

165.    The health, stability, and growth of the orthodontic practice at West Coast Dental, along with the anticipation of new growth, were critical factors to Court Square (and by extension, Buyer, Inc. and Parent, LLC) during its evaluation of West Coast Dental and its decision whether to move forward with the transaction at the inflated Purchase Price.

166.    The implementation of the numerous frauds detailed herein accomplished this deceit by showing substantially higher revenue and EBITDA on paper than what was actually occurring: *i.e.*, the orthodontic practice was in decline as Court Square was developing its valuation model for a purportedly growing business.

**K.    The False Representations and Omissions Were Material and Damaged Plaintiffs.**

167.    Had Plaintiffs known about the misrepresentations and omissions detailed herein, among other things, that information would have drastically lowered Plaintiffs' valuation of West Coast Dental and the Purchase Price for the Shares.  In fact, Plaintiffs estimate they would have paid in excess of $47 million *less* than what they paid for the Shares (if they would have purchased them at all) if they had known of the financial impacts of the six different frauds detailed herein and uncovered to date.

168.    Each of the frauds impacted the growth trajectory upon which Plaintiffs were relying for their pricing model and the ultimate Purchase Price of the Shares.

169.    As a result, Plaintiffs were damaged by the misrepresentations and omissions relating to the multiple frauds by entering into the Purchase Agreements

43

COMPLAINT

and agreeing to a Purchase Price for the Shares that did not reflect their real or actual value.

**L.      The False Representations and Omissions Proximately Caused Plaintiffs' Loss.**

170.    Had Plaintiffs known about the misrepresentations and omissions detailed herein, Plaintiffs would not have paid the Purchase Price they paid for the Shares.

171.    Had Plaintiffs known about the misrepresentations and omissions detailed herein, Court Square would not have continued to submit multiple increasing bids from March 2022 through June 2022.

**FIRST CLAIM FOR RELIEF**

**SECURITIES FRAUD IN VIOLATION OF SECTION 10(B) OF THE SECURITIES EXCHANGE ACT OF 1934 AND RULE 10B-5 OF THE SECURITIES AND EXCHANGE COMMISSION**

*(By Plaintiffs Against All Defendants)*

172.    Plaintiffs incorporate the foregoing paragraphs as if fully set forth herein.

173.    The sale of the Shares by Frontier Holdco, the Founders, and the Other Shareholders under the Purchase Agreements qualifies as the sale of a security within the meaning of, *inter alia*, the Securities Act of 1933 and the Securities Exchange Act of 1934.

174.    Section 10(b) of the Securities Exchange Act of 1934 provides that it "shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails . . . [t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for

44

1    the protection of investors."

2        175.    Rule 10b-5 adopted by the U.S. Securities and Exchange Commission

3    provides that "[i]t shall be unlawful for any person, directly or indirectly, by the use

4    of any means or instrumentality of interstate commerce, or of the mails or of any

5    facility of any national securities exchange, (a) to employ any device, scheme, or

6    artifice to defraud, (b) to make any untrue statement of a material fact or to omit to

7    state a material fact necessary in order to make the statements made, in the light of

8    the circumstances under which they were made, not misleading,

9        176.    Defendants committed securities fraud in connection with the sale of

10   the Shares to Buyer, Inc. and Parent, LLC by use of the means and instrumentalities

11   of interstate commerce, or of the mails, in connection with the purchase and sale of

12   securities knowingly (a) employing devices, schemes or artifices to defraud and (b)

13   engaged in acts, practices or courses of business which operated as a fraud or deceit

14   upon Plaintiffs, who purchased the securities offered by Defendants.

15       177.    Defendants' misstatements and omissions of material facts include, but

16   are not limited to the Representations and Warranties in the EPA identified in

17   paragraphs 105 to 127, the misrepresentations and omissions in the WCD Offering

18   Documents identified in paragraphs 127 to 147, as well as all other misstatements

19   and omissions identified herein relating to the PPP Fraud, the 99/99 Fraud, the

20   RevRec Fraud, the Bad Debt Fraud; the $500K Fraud; and the Calimesa Fraud, all as

21   described in paragraphs 14–26 and 66–100, which are incorporated herein.

22       178.    Defendants' misrepresentations or omissions of material facts are the

23   actual and proximate cause of Plaintiffs' injuries.  But for the misrepresentations and

24   omissions, Plaintiffs would not have entered into the Purchase Agreements or closed

25   on the purchase of the Shares.

26       179.    Moreover, the fraudulent statements or omissions were the cause of the

27   actual loss suffered by Plaintiffs in excess of $47 million.

28       180.    By virtue of the foregoing, Defendants, and each of them, violated

COMPLAINT

Section 10(b) of the Securities Exchange Act, 15 U.S.C. 78j(b) and Rule 10b-5 thereunder, C.F.R. § 240.10b-5, for which Plaintiffs suffered damages in connection with the purchase and sale of the Shares and seek restitution, or damages in an amount to be determined at trial.

**SECOND CLAIM FOR RELIEF**

**VIOLATION OF THE SECURITIES EXCHANGE ACT §20**

*(By Plaintiffs Against All Defendants)*

181.    Plaintiffs incorporate the foregoing paragraphs as if fully set forth herein.

182.    By virtue of their high level positions, participation in and/or awareness of West Coast Dental's operations and/or intimate knowledge of the misstatements and omissions made to Plaintiffs, the Officers (collectively, the "**Control Group**") had the power to influence and control, and did influence and control, directly or indirectly, the decision making of West Coast Dental, including the distribution to Plaintiffs of marketing materials, financial statements, and Representations and Warranties in the EPA that contained misstatements or omissions and other false information as set forth herein.

183.    The Control Group was provided with or had unlimited access to information concerning West Coast Dental's marketing materials, IHF, and all relevant information pertinent to the PPP Fraud, the 99/99 Fraud, the RevRec Fraud, the Bad Debt Fraud, the $500K Fraud, and the Calimesa Fraud.  As a result, the Control Group had the ability to prevent the issuance of false and misleading statements, omissions, representations, and warranties, or cause any false or misleading statements or representations to be corrected.

184.    In particular, each member of the Control Group had direct and supervisory involvement in the marketing of West Coast Dental for sale, seeking to maximize the Purchase Price for the Shares, and the power to control or to influence the marketing and sale process, the WCD Offering Documents and information

46

COMPLAINT

1  provided to Plaintiffs, and the Representations and Warranties made under the EPA.

2      185.   As set forth above, the Defendants violated Section 10(b) of the

3  Securities Exchange Act, 15 U.S.C. 78j(b) and Rule 10b-5 thereunder, C.F.R. §

4  240.10b-5 by their acts and/or omissions as alleged in this Complaint.

5      186.   By virtue of their positions as controlling persons, the members of the

6  Control Group are liable pursuant to Section 20(a) of the Securities Exchange Act.

7      187.   As a direct and proximate result of the individual Defendants' wrongful

8  conduct, Plaintiffs suffered damages in connection with the purchase and sale of the

9  Shares and seek, restitution, or damages in an amount to be determined at trial.

10                      **THIRD CLAIM FOR RELIEF**

11                              **FRAUD**

12                  *(By Plaintiffs Against All Defendants)*

13      188.   Plaintiffs incorporate the foregoing paragraphs as if fully set forth

14  herein.

15      189.   As set forth above, each of the Defendants caused the EPA to contain

16  numerous false Representations and Warranties, including those identified in

17  paragraphs 105–127, which are incorporated herein.  Such Representations and

18  Warranties are false as a result of the PPP Fraud, the 99/99 Fraud, the RevRec

19  Fraud, the Bad Debt Fraud; the $500K Fraud; and the Calimesa Fraud, all as

20  described in paragraphs 14–26 and 66–100, which are incorporated herein

21      190.   Defendants committed such fraud to induce Plaintiffs to enter into the

22  Purchase Agreements and purchase the Shares.

23      191.   Defendants knowingly and intentionally made such misstatements or

24  omissions of material facts with the intent to induce Plaintiffs to enter into the

25  Purchase Agreements and purchase the Shares.

26      192.   At the time Defendants made the foregoing representations and

27  omissions, Defendants knew that said representations were false.

28      193.   Defendants thus made the foregoing false representations and omissions

of material fact with actual knowledge that said representations and omissions were false and misleading, and with the intent that Plaintiffs rely on those representations and omissions and to induce Plaintiffs to enter into the Purchase Agreements and close on the purchase of the Shares.

194.   Plaintiffs reasonably relied on Defendants' misrepresentations or omissions in the Representations and Warranties and Marketing Materials identified herein when entering the Purchase Agreements.

195.   Defendants' misrepresentations or omissions of material facts in the EPA are the actual and proximate cause of Plaintiffs' injuries.  But for the misrepresentations or omissions, Plaintiffs would not have entered into the Purchase Agreements.  Moreover, the fraudulent statements or omissions were the cause of the actual loss suffered by Plaintiffs in excess of $47 million.

196.   As a result of Defendants' fraud, Plaintiffs sustained losses and seek restitution, or damages in an amount to be determined at trial.

197.   These misrepresentations and omissions of material fact were widespread, gross, and oppressive.

198.   Rather than engaging in a fair and reasonable business transaction, Defendants chose to engage in fraudulent conduct that overstated the value of the Shares by millions of dollars.

199.   Defendants concealed key information, and actively lied to induce Plaintiffs to enter into this transaction.  Accordingly, Plaintiffs seek punitive damages against Defendants for their fraudulent conduct.

## FOURTH CLAIM FOR RELIEF
### CONSPIRACY TO COMMIT FRAUD
*(By Plaintiffs Against All Defendants)*

200.   Plaintiffs incorporate the foregoing paragraphs as if fully set forth herein.

201.   One or more of the Officers agreed to and did in fact work together

48

COMPLAINT

with Frontier Holdco, the Founders, and the Other Shareholders with intent to defraud Plaintiffs into entering the Purchase Agreements for a Purchase Price for the Shares that did not reflect their real or actual value.

202. One or more of the Officers committed the overt acts described herein in furtherance of their conspiracy.

203. As a result of the conspiracy, Plaintiffs sustained losses and seek restitution, or damages in an amount to be determined at trial.

## FIFTH CLAIM FOR RELIEF

### AIDING AND ABETTING FRAUD

*(By Plaintiffs Against All Defendants)*

204. Plaintiffs incorporate the foregoing paragraphs as if fully set forth herein.

205. One or more of the Officers aided and abetted one another as well as the Founders, Frontier Holdco, and the Other Shareholders in making intentionally and knowingly false Representations and Warranties and other misrepresentations and omissions regarding WCD, Inc. and the Practice Entities.

206. The Officers engaged in such conduct with actual knowledge that the Representations and Warranties and the other misrepresentations and omissions they made or caused to be made in the EPA were false and misleading.

207. Such conduct was intended to, and did in fact, induce Plaintiffs to enter the Purchase Agreements and purchase the Shares at an inflated Purchase Price that Plaintiffs would not otherwise have paid. The Officers provided substantial assistance in furtherance of the scheme to defraud Plaintiffs, including by making the false Representations and Warranties and other misrepresentations and omissions in the Marketing Materials as detailed in paragraphs 105 through 147.

208. Plaintiffs reasonably relied on the misrepresentations or omissions in the Representations and Warranties and Marketing Materials identified herein when entering the Purchase Agreements.

209.   As a result of this reliance, Plaintiffs sustained losses and seek restitution or damages in an amount to be determined at trial.

**SIXTH CLAIM FOR RELIEF**

**VIOLATION OF SECTIONS 25400 AND 25500 OF THE CALIFORNIA CORPORATE SECURITIES ACT**

*(By Plaintiffs Against All Defendants)*

210.   Plaintiffs incorporate the foregoing paragraphs as if fully set forth herein.

211.   Defendants were persons selling or offering for sale the Shares in the state of California, where the Defendants reside or maintain their business, and where the principal office of WCD, Inc. is located, for the purpose of inducing the purchase of the Shares and made statements that, at the time and in light of the circumstances under which the statements were made, were false and misleading with respect to material facts, or which omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and which Defendants knew or had reasonable ground to believe were false and misleading in violation of §§ 25400 and 25500 of the California Corporate Securities Act.

212.   By virtue of the wrongful conduct of Defendants, the Plaintiffs were induced to enter into the EPA and did Purchase the Shares.

213.   The Purchase Price for the Shares was affected by the misrepresentations and omissions because the misrepresentations and omissions concealed the multiple frauds identified herein, their financial impact on West Coast Dental, and the true state of West Coast Dental's business.  This resulted in a wrongfully inflated purchase price for the Shares.  The Shares were not worth the Purchase Price that Plaintiffs paid for them.

**SEVENTH CLAIM FOR RELIEF**

**VIOLATION OF SECTIONS 25401 AND 25501 OF THE CALIFORNIA CORPORATE SECURITIES ACT**

*(By Plaintiffs Against All Defendants)*

214.   Plaintiffs incorporate the foregoing paragraphs as if fully set forth herein.

215.   The Officers offered to sell and did sell the Shares from the state of California by means of written and/or oral communications which included untrue statements of material fact and omitted to state material facts necessary to make those statements made, in light of the circumstances under which they were made, not misleading in violation of §§ 25401 and 25501 of the California Corporate Securities Act.

216.   By virtue of the untrue statements of material fact and omitted material facts made by the Officers, Plaintiffs were induced to and did purchase the Shares.

217.   As a direct and proximate result of the hereinabove alleged violations of §§ 25401 and 25501 of the California Corporate Securities Act, the Plaintiffs have suffered damages.

**EIGHTH CLAIM FOR RELIEF**

**VIOLATION OF SECTION 25504.1 OF THE CALIFORNIA CORPORATE SECURITIES ACT**

*(By Plaintiffs Against All Defendants)*

218.   Plaintiffs incorporate the foregoing paragraphs as if fully set forth herein.

219.   If the Officers did not offer or sell the Shares to the Plaintiffs, they had knowledge of the false and misleading statements and/or omissions constituting the above-described primary violation of the California Corporate Securities Act and materially assisted in the above-described primary violation of the California Corporate Securities Act with the intent to deceive and/or to defraud in violation of §

51

1  25504.1 of the California Corporate Securities Act.

2      220.  By virtue of the wrongful conduct of Defendants, the Plaintiffs were

3  induced to enter into the EPA and did purchase the Shares.

4      221.  As a direct and proximate result of the hereinabove alleged violation of

5  § 25504.1 of the California Corporate Securities Act, the Plaintiffs have suffered

6  damages.

7  **<u>PRAYER FOR RELIEF</u>**

8  WHEREFORE Plaintiffs respectfully pray for relief as follows:

9      (a)    compensatory damages in an amount appropriate to compensate them

10              for damages caused by Defendants' fraud and other wrongful conduct

11              in an amount to be determined at trial;

12      (b)    punitive damages against Defendants;

13      (c)    their costs, attorneys' fees pursuant to contract or otherwise,

14              prejudgment interest, and post judgment interest; and

15      (d)    any other relief that the Court deems just and appropriate.

16

17  Plaintiffs respectfully demand a trial by jury on all claims so triable.

18

19                          **KATZ LAW OFFICE PC**

20

21  Date: November 18, 2024       By:   <u>/s/ *Michael I. Katz*</u>

22                                 Michael I. Katz

23                                 Nathan M. Carle

                               *Attorneys for Plaintiffs*

24

25

26

27

28

# EXHIBIT A
**REDACTED DOCUMENT
PROPOSED TO BE FILED UNDER SEAL**

# EXHIBIT B

## REDACTED DOCUMENT
## PROPOSED TO BE FILED UNDER SEAL

# EXHIBIT C

EXECUTION VERSION

**THIS NOTE HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933 AND MAY NOT BE SOLD OR TRANSFERRED EXCEPT PURSUANT TO AN EXEMPTION FROM, OR OTHERWISE IN A TRANSACTION NOT SUBJECT TO, THE REGISTRATION REQUIREMENTS OF SUCH ACT. NO TRANSFER, SALE OR ASSIGNMENT OF THIS NOTE SHALL BE EFFECTIVE UNLESS MADE IN EXPRESS COMPLIANCE HEREWITH. NOTEHOLDER OF THIS NOTE, BY ITS ACCEPTANCE HEREOF, SHALL BE BOUND BY THE PROVISIONS HEREOF.**

**THIS NOTE AND THE INDEBTEDNESS EVIDENCED HEREBY ARE SUBORDINATE IN THE MANNER AND TO THE EXTENT SET FORTH IN SECTION 6 HEREOF, AND NOTEHOLDER OF THIS NOTE, BY ITS ACCEPTANCE HEREOF, SHALL BE BOUND BY THE PROVISIONS THEREOF.**

**UNSECURED SUBORDINATED PROMISSORY NOTE**

July 1, 2022

   **FOR VALUE RECEIVED**, WCDS Parent, LLC, a Delaware limited liability company (the "Borrower"), hereby unconditionally promises to pay to Frontier Holdco, Inc., a Delaware corporation (the "Noteholder"), in lawful money of the United States of America and in immediately available funds, the outstanding principal amount of this Note that is owed to Noteholder as set forth on Schedule 1 hereto, or such principal amount as may be outstanding from time to time, together with interest on such outstanding principal amount as set forth in Section 1 below, subject to the terms and conditions set forth in this promissory note (this "Note"). Any capitalized term used but not otherwise defined herein shall have the meaning set forth in that certain Equity Purchase Agreement, dated June 1, 2022 (as amended from time to time, the "Purchase Agreement"), by and among (i) WCDS Buyer, Inc., a Delaware corporation ("Buyer"), (ii) Noteholder, (iii) West Coast Dental Services, Inc., a California corporation (the "Company"), and (iv) the Persons listed in Exhibit A of the Purchase Agreement.

1.  **Interest**. The outstanding principal amount of this Note shall bear interest at eight percent (8.00%) per annum; provided, however, that during the continuance of an Event of Default (as defined below), the interest rate shall increase by an additional four percent (4.00%). Interest on this Note shall accrue from and after the date hereof and shall be calculated on the basis of the actual number of days elapsed over a 360-day year comprised of twelve 30-day months.

2.  **Principal and Payment**.

   (a)  The principal amount owed to Noteholder as of the date hereof is set forth opposite to the name of Noteholder on Schedule 1. Amounts repaid or prepaid in respect of this Note may not be reborrowed.

   (b)  Borrower shall make quarterly payments of accrued interest only on the outstanding principal balance of this Note commencing on the last day of the first calendar quarter following the Closing Date, and thereafter on March 31, June 30, September 30 and December 31 of each year unless and until this Note has been paid in full as provided for herein; provided that, pursuant to Section 6 below, if Borrower is not permitted to make an interest payment hereon when due by reason of the existence of an event of default under the Senior Indebtedness (defined below), then the accrued amount of such interest shall automatically be paid in kind by adding the amount thereof to the then outstanding principal amount of this Note, effective as of the due date therefor. Each payment shall be in the amount of the accrued, but unpaid, interest through the date immediately preceding

the date such payment is due.

(c)    Subject to <u>Section 6</u> below, the entire remaining principal balance and accrued, but unpaid interest, fees and other amounts due under this Note shall be payable in full in immediately available funds on the earliest of (x) the date on which any acceleration pursuant to <u>Section 4(b)</u> due to an Event of Default occurs or (y) seven (7) years after the Closing Date (the earliest of (x) or (y) being the "<u>Maturity Date</u>").

(d)    All amounts payable hereunder shall be made for the account of Noteholder pursuant to the wire instructions set forth on <u>Schedule 1</u> hereof or pursuant to such wire instructions as Noteholder may designate in accordance with the terms of this Note not less than three (3) Business Days prior to the Maturity Date or any other relevant payment date hereunder.

(e)    Whenever any payment to be made hereunder shall be due on a date which is not a Business Day, the payment shall be made on the next succeeding Business Day, and interest shall continue to accrue at the required rate hereunder until any such payment is made. All payments by Borrower hereunder shall be applied first against accrued interest, fees or other amounts due under this Note and then to any principal owing under this Note.

3.    **Prepayment**. Subject to <u>Section 6</u> below, Borrower may, without premium or penalty, at any time and from time to time prior to the Maturity Date, prepay all or any portion of the outstanding balance due under this Note. Any such prepayment shall be applied first against accrued interest and, thereafter, against the outstanding principal balance hereunder.

4.    **Events of Default**.

(a)    <u>Definition</u>. Any one or more of the following shall be an "<u>Event of Default</u>" under this Note:

(i)    Borrower shall fail to make any payment under this Note when the same shall become due and payable, and such failure continues for five (5) Business Days thereafter; or

(ii)    Borrower fails to comply with any other provision of this Note beyond any applicable cure period, if any; or

(iii)    The occurrence of a Change In Control without the prior written consent of Noteholder, which consent will not be unreasonably withheld; or

(iv)    (A) Borrower shall commence any case, proceeding or action (x) under any existing or future law of any jurisdiction, domestic or foreign, relating to bankruptcy, insolvency, reorganization or relief of debtors, seeking to have an order for relief entered with respect to it, or seeking to adjudicate it bankrupt or insolvent, or seeking reorganization, arrangement, adjustment, winding-up, liquidation, dissolution, composition or other relief with respect to its debts or (y) seeking appointment of a receiver, trustee, custodian or other similar official for it or for all or any substantial part of its assets, (B) Borrower shall make a general assignment for the benefit of its creditors, (C) there shall be commenced against Borrower any case, proceeding or other action of a nature referred to in clause (A) above which shall not have been vacated or discharged within ninety (90) days from the commencement thereof or (D) a court shall enter a decree or order for

2

relief against Borrower in any involuntary case under Title 11 of the United States Code, as amended from time to time, or any applicable bankruptcy or similar law now or hereafter in effect, which decree or order is not stayed, vacated, discharged, or bonded pending appeal within ninety (90) days from the entry thereof.

For purposes hereof, "Change In Control" means the occurrence of any of the following events: (y) an acquisition of Borrower or Borrower's parent by another entity by means of any transaction or series of related transactions (including, without limitation, any reorganization, merger or consolidation but excluding any merger effected exclusively for the purpose of changing the domicile of Borrower) in which Borrower's or Borrower's parent's equity holders of record immediately prior to such transaction will, immediately after such transaction or series of transactions, hold less than fifty percent (50%) of the voting power of the surviving or acquiring entity; or (z) the sale of all or substantially all of Borrower's or Borrower's parent's assets.

(b)    Remedies. If an Event of Default described in Section 4(a) above shall occur, then this Note and all amounts owed hereunder shall immediately and without notice of any kind be accelerated and be fully due and payable, all without presentment, demand, protest or any notice of any kind. Borrower agrees, in case of an Event of Default, to pay all costs of Noteholder for collection of this Note and all other liabilities of Noteholder under this Note, including reasonable attorneys' fees and legal expenses including participation in bankruptcy proceedings. In addition, upon any Event of Default, Noteholder shall have all other rights in respect of this Note following the occurrence and during the continuance of an Event of Default which are available pursuant to applicable law or in equity. No failure to exercise, and no delay in exercising, any rights under this Note on the part of Noteholder shall operate as a waiver of such rights.

5.    **Unsecured Obligation**. This Note is not secured by any liens or security interests in, on or covering any assets of Borrower or its Affiliates.

6.    **Subordination**. This Note is subordinate and junior in right of payment to the prior payment in full of all claims, whether now existing or arising in the future, of holders of the Senior Indebtedness (as defined below) of Borrower and Buyer. Noteholder, by accepting this Note, agrees to promptly upon request execute and deliver one or more subordination agreements, in such form as may be reasonably required with respect to and upon the incurrence of the Senior Indebtedness. Each holder of Senior Indebtedness, whether now outstanding or hereafter arising, shall be deemed to have acquired such Senior Indebtedness in reliance upon the provisions contained herein. Notwithstanding anything to the contrary contained in this Note, Noteholder hereby agrees that Borrower shall not be required to make, and Noteholder shall not be permitted to receive or retain, all or any portion of the amounts otherwise due and payable under this Note if an event of default has occurred and is continuing under the Senior Indebtedness. In the event that, as a result of the application of the preceding sentence, Borrower is not permitted to make and Noteholder is not permitted to receive or retain all or any portion of the amounts owed under this Note, then (i) any such unpaid amounts shall constitute an unsecured obligation of Borrower to Noteholder and (ii) such unpaid amounts shall not be due and payable until the first such date that no event of default exists under the Senior Indebtedness, whether by waiver or cure or otherwise (provided that the foregoing shall not be deemed to prohibit the payment in kind of interest as permitted in paragraph 2(b) hereof). Noteholder acknowledges and agrees that Noteholder shall not sue for or otherwise take any collection action against Borrower for any unpaid amounts or exercise any right of setoff or recoupment with respect to the amounts due under this Note or any other remedies at law, in equity, by contract or otherwise as a result of the failure to pay any amounts owed under this Note when due and payable to Noteholder by reason of the existence of an event of default under the

3

Senior Indebtedness. Each holder of the Senior Indebtedness, together with their successors and assigns, shall be deemed to be intended third party beneficiaries of the foregoing provisions of this Note, and Noteholder agrees that (i) no terms hereunder relating to any amounts owed hereunder shall be amended, supplemented or otherwise modified without the prior written consent of the senior agent of the Senior Indebtedness and (ii) each holder of Senior Indebtedness shall be permitted to enforce the provisions of this paragraph against Noteholder in their own name or in the name of Borrower. Any payments received by Noteholder in violation of the terms hereof shall be immediately paid by Noteholder to the senior agent of the Senior Indebtedness for the benefit of the senior lenders for the Senior Indebtedness, per written instructions from such senior agent. For purposes of this Note, "Senior Indebtedness" shall mean, whether now existing or hereafter arising: (i) all principal, interest, fees, reimbursements, indemnifications and other amounts (including interest accruing after the filing of a petition initiating any bankruptcy or insolvency) owed by Borrower or Buyer for borrowed money to BMO Harris Bank N.A., Benefit Street Partners and Bank of Montreal, acting under its tradename BMO Sponsor Finance and their respective successors and assigns and (ii) any renewals, deferrals, refinancings, extensions, refunding, amendments, modifications or any debentures, notes or other evidence of indebtedness issued in exchange for any of the indebtedness referred to in clause (i).

7.    **Taxes**.

(a)    Borrower and Noteholder agree that amounts payable pursuant to this Note are being paid in consideration for Purchased Securities under the Purchase Agreement. Furthermore, it is the intention of the parties that the payment of such amounts will be treated as being paid in exchange for such Purchased Securities for income Tax purposes, and the parties agree to take reasonable efforts to ensure such tax treatment. Borrower and Noteholder agree to report such payments for income Tax purposes as consideration for Purchased Securities, except as otherwise required by applicable Law as determined by a final determination of the applicable taxing authority.

(b)    The amount of this Note will be treated as part of the purchase price under the Purchase Agreement and will not be treated for Tax purposes as having been received by Noteholder unless and until payments are actually made under this Note unless such Noteholder has made an election pursuant to Code Section 453(d) not to report the receipt of such funds under the installment method. The parties agree to make all Tax filings in a manner consistent with the foregoing and to take reasonable efforts to ensure such treatment, except as otherwise required by a final determination made in accordance with applicable Law.

8.    **No Presentment**. Borrower, for itself and its successors and assigns, waives presentment, demand, protest and notice thereof or of dishonor, and waives any right to be released by reason of any extension of time or change in the terms of payment.

9.    **Amendments and Waivers**. No amendment, modification, forbearance or waiver of any provision of this Note, and no consent with respect to any departure by Borrower therefrom, shall be effective unless the same shall be in writing and signed by Noteholder and Borrower.

10.    **Cancellation**. After all unpaid principal, interest, fees and other amounts due under this Note have been indefeasibly paid in full, this Note shall be surrendered to Borrower for cancellation and shall not be reissued.

11.    **Right to Set-Off**. Noteholder hereby agrees that Borrower shall have the right to set-off and shall receive credit against any and all obligations of Borrower under this Note any and all Losses (as

defined below) incurred by Borrower or any of its Affiliates in connection with, based upon, resulting from or relating to the PPP Loans (as defined below). Any exercise of such set-off right shall for all purposes be treated as a prepayment of this Note, and notwithstanding anything contained in this Note to the contrary, in no event shall such exercise be considered an Event of Default under this Note. For the purposes hereof, "Losses" means any damage, loss, charge, liability, obligation, Order, demand, claim, settlement, award, deficiency, principal, interest, penalty, fine, Tax or other cost or expense (including attorneys', accountants' and experts' fees and disbursements) based upon, resulting from or relating to an audit or other Proceeding by any Governmental Authority of any PPP Loan that results in a final, non-appealable determination that all or any portion of any PPP Loan is ineligible for forgiveness. Further, for the purposes hereof, "PPP Loans" mean any "Paycheck Protection Program" loan that any Target Company received pursuant to the CARES Act, the Families First Coronavirus Response Act or any other Law relating to COVID-19.

12.    **Governing Law; Submission to Jurisdiction; Waiver of Jury Trial**.

(a)    THIS NOTE SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF DELAWARE, WITHOUT REGARD TO PRINCIPLES OF CONFLICT OF LAWS THEREOF.

(b)    EACH PARTY TO THIS NOTE HEREBY IRREVOCABLY AGREES THAT ANY LEGAL ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS NOTE OR ANY AGREEMENTS OR TRANSACTIONS CONTEMPLATED HEREBY SHALL BE BROUGHT EXCLUSIVELY IN THE STATE OR FEDERAL COURTS LOCATED IN NEW CASTLE COUNTY WITHIN THE STATE OF DELAWARE AND HEREBY EXPRESSLY SUBMITS TO THE PERSONAL JURISDICTION AND VENUE OF SUCH COURTS FOR THE PURPOSES THEREOF AND EXPRESSLY WAIVES ANY CLAIM OF IMPROPER VENUE AND ANY CLAIM THAT SUCH COURTS ARE AN INCONVENIENT FORUM.

(c)    TO THE EXTENT PERMITTED BY APPLICABLE LAW, BORROWER, BY EXECUTION HEREOF, AND NOTEHOLDER, BY ACCEPTANCE HEREOF, KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE ANY RIGHT THEY MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION BASED ON THIS NOTE, OR ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS NOTE OR ANY AGREEMENT CONTEMPLATED TO BE EXECUTED IN CONNECTION WITH THIS NOTE, OR ANY LITIGATION ARISING OUT OF ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENTS (WHETHER VERBAL OR WRITTEN) OR ACTIONS OF ANY PARTY WITH RESPECT HERETO.

13.    **Descriptive Headings**. The descriptive headings of this Note are inserted for convenience only, and do not constitute a part of this Note.

14.    **Notices**. All notices, demands and other communications to be given or delivered under or by reason of the provisions of this Note shall be in writing and shall be deemed to have been given when (a) personally delivered, (b) one (1) day after deposit with Federal Express or similar overnight courier service, (c) three (3) days after being mailed by first class mail, return receipt requested (in each case of this clause (c) and clauses (a) and (b), with a courtesy copy delivered by electronic mail), and (d) upon transmission by electronic mail during normal business hours or, if not during normal business hours, the next Business Day after transmission (provided that no "error" message or other notification of non-delivery is received by the sender). Notices, demands

and communications to Noteholder and Borrower shall, unless another address is specified in writing, be sent to the addresses indicated below.

if to Noteholder:

Frontier Holdco, Inc.
427 S Bristol Ave
Los Angeles CA 90049
Attention:      Farid Pakravan
Email:          pakravanfarid@gmail.com

*in each case with a copy (which shall not constitute notice) to*:

Dykema Gossett, PLLC
1717 Main Street
Suite 4200
Dallas, Texas 75201
Attention:      Brian Colao
                Craig Woods
Email:          bcolao@Dykema.com
                cwoods@Dykema.com

if to Borrower, to:

WCDS Parent, LLC
c/o Court Square Capital Partners, L.P.
299 Park Avenue, 35th Floor
New York, NY 10171
Attention:      John Weber
                Jeff Abramoff
Email address:  jweber@courtsquare.com
                jabramoff@courtsquare.com

*with a copy (which shall not constitute notice) to*:

Winston & Strawn LLP
200 Park Avenue
New York, NY 10166-4193
Attention:      Craig Godshall
                Timothy Kincaid
Email:          CGodshall@winston.com
                TKincaid@winston.com

15.    **Successors and Assigns**. Borrower may not assign or transfer its obligations or rights in whole or in part under this Note, without the prior written consent of Noteholder. This Note shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and permitted assigns, but this provision will not constitute a consent by Noteholder to assignment by Borrower otherwise prohibited by the preceding sentence.

16.    **Severability**. Whenever possible, each provision of this Note shall be interpreted in such a manner as to be valid, legal and enforceable under the applicable law of any jurisdiction. Without limiting

the generality of the foregoing sentence, in case any provision of this Note shall be invalid, illegal or unenforceable under the applicable law of any jurisdiction, the validity, legality and enforceability of the remaining provisions, or of such provision in any other jurisdiction, shall not in any way be affected or impaired thereby.

17.     **Entire Agreement**. This Note and other agreements and documents referenced herein and therein constitute the entire understanding between the parties with respect to the subject matter hereof, and all prior or contemporaneous written and oral agreements, understandings, representations and statements with respect thereto are replaced and superseded by this Note.

18.     **No Third-Party Beneficiaries**. Except as expressly set forth herein, nothing express or implied in this Note is intended or shall be construed to confer upon or give any person other than the parties hereto and their respective successors and assigns any right, benefit or remedy under or by reason of this Note.

19.     **Counterparts**. This Note may be executed in counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument and shall become effective when one or more counterparts have been signed by each of the parties and delivered to the other parties. Copies of signatures transmitted by electronic means (including via PDF) will be deemed to be originals.

20.     **Authority**. Borrower has duly authorized the execution, delivery and performance of this Note.

21.     **Time of the Essence**. Time is of the essence of this Note.

22.     **Construction**. No provision of this Note shall be construed in favor of, or against, any particular party by reason of any presumption with respect to the drafting of this Note; both parties, being represented by counsel, having fully participated in the negotiation of this Note.

*[signature pages follow]*

IN WITNESS WHEREOF, Borrower has executed and delivered this Note on the date first written above.

WCDS PARENT, LLC

By: _____

Name:  Jeffrey Abramoff
Title:   Vice President

*ACKNOWLEDGED AND AGREED BY NOTEHOLDER:*

FRONTIER HOLDCO, INC.

By: _____

Name: Farid Pakravan
Title: Secretary

*[Signature Page to Unsecured Subordinated Promissory Note]*

**SCHEDULE 1**

| Noteholder | Wire Instructions | Principal Amount |
|---|---|---|
| Frontier Holdco, Inc. | Provided separately. | $5,000,000 |